BUD ANTLE, INC., dba Bud
of California, Plaintiff–
Appellant,

v.

J. Antonio BARBOSA, personally and in his official capacity as Executive Secretary of the California Agricultural Labor Relations Board; Bruce J. Janigan, personally and in his official capacity as Chairman of the California Agricultural Labor Relations Board; Ivonne Ramos Richardson, personally and in her offi-

cial capacity as a member of the California Agricultural Labor Relations Board; and Linda A. Frick, personally and in her official capacity as a member of the California Agricultural Labor Relations Board, Defendants–Appellees.

Nos. 93–15002, 93–15642 and 93–15652.

United States Court of Appeals, Ninth Circuit.

Argued and Submission Deferred March 15, 1994.

Submitted Aug. 29, 1994.

Decided Sept. 9, 1994.

As Amended on Denial of Rehearing Jan. 17, 1995.

Scott A. Wilson, Theodore R. Scott, Littler, Mendelson, Fastiff, Tichy & Mathiason, San Diego, CA, for plaintiff-appellant.

Sharon M. Shiller Hartwell, Gregory L. Hartwell, Hartwell & Hartwell, Sacramento, CA; J. Antonio Barbosa, Executive Secretary, Susan P. Underwood, Sol., Agricultural Labor Relations Bd., Sacramento, CA, for defendants-appellees.

Frederick L. Feinstein, Gen. Counsel, Linda R. Sher, Acting Associate Gen. Counsel, Eric G. Moskowitz, Deputy Asst. Gen. Counsel for Sp. Litigation, Nancy E. Kessler

Platt, Atty., N.L.R.B., Washington, DC, for amicus curiae.

Before: CHOY, REINHARDT, and LEAVY, Circuit Judges.

### ORDER

The petition for rehearing is denied.

The opinion filed September 9, 1994, 35 F.3d 1355, is ordered amended as follows.

At p. 1361 n. 11, change the first full paragraph to read:

Four of the company's six causes of action potentially involve theories other than *Garmon* preemption. We conclude that the district court properly dismissed the company's third and sixth causes of action. However, the district court's dismissal order makes no mention of the fourth and fifth causes of action. Therefore, we remand these two claims to the district court for its consideration.

At p. 1361, delete the third paragraph.

### OPINION

REINHARDT, Circuit Judge:

This case involves several complicated questions regarding the preemptive effect of the National Labor Relations Act ("NLRA" or "the Act"). Bud Antle, Inc., ("Bud" or "the company") appeals the district court's Rule 12(b)(6) dismissal of its action against the members and executive secretary of the California Agricultural Labor Relations Board ("ALRB" or "state board").[1] The company claims that the National Labor Relations Act ousts the ALRB of jurisdiction to adjudicate various unfair labor practice charges which are now pending before the state board. It seeks injunctive relief to prohibit the ALRB from continuing its proceedings. The district court concluded that the NLRA does not preempt ALRB jurisdiction over the charges. It also held that it was required to abstain pursuant to *Younger*

*v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Bud challenges both of these decisions on appeal, and we reverse.

### I.

The ALRB, a state agency, is organized in a similar manner to the NLRB. It administers a statute (the Agricultural Labor Relations Act, or ALRA) that, in its form but not its scope, is nearly identical to the NLRA. For purposes of this case, there is only one difference, fundamental as it is, between the NLRA and the ALRA: the NLRA expressly *excludes* "agricultural laborers" from coverage, *see* 29 U.S.C. § 152(3), while the ALRA applies *only* to agricultural employees excluded from NLRA coverage. *See* Cal.Labor Code §§ 1140.4, 1148. This case revolves around several unfair labor practice charges which were filed against Bud and are currently pending before the state board. These charges arose from a dispute which occurred during 1989 contract negotiations between Bud and Local 78–B of the Fresh Fruit and Vegetable Workers ("FFVW" or "the union"), the representative of Bud's employees who handled or processed agricultural goods at several cooling facilities in California ("the bargaining unit"). The basic question is whether as of 1989 the employees involved were agricultural laborers who were clearly excluded from coverage under the NLRA. Only if they were not actually or arguably covered under that act, would they have been subject to the jurisdiction of the ALRB.

Bud markets about 40 million cartons of fresh vegetables each year, giving it the largest volume of any producer of fresh vegetables in the United States. At one time, the company functioned as a fully integrated operation and used its own employees and equipment to grow, harvest, cool, pack, transport and market the crops it produced. However, beginning in approximately 1981 or 1982, it began to change its mode of operation by divesting itself of its primary growing operations. Bud has turned instead to a

---

1. Although the ALRB itself is not a named party to this action, we will refer to the defendants collectively as "the ALRB."

variety of contracting-out arrangements in order to secure produce for marketing. Under these arrangements, the company agrees with independent growers to purchase crops raised on the growers' land.[2] Although Bud oversees various aspects of the growers' operations and may participate in transplanting and harvesting crops, the growers are responsible for cultivation and often bear the risk of any crop failure during the growing season. The company relied more and more heavily on these arrangements throughout the 1980s, and it grew its last crop in 1989. Thus, it now relies exclusively on these contracting-out practices to obtain its products.

The unfair labor practice charges in this case involve employees in Bud's cooling facilities. These facilities are located away from the farms on which the produce is grown. The ALRB certified the union as the exclusive representative of the bargaining unit employees in 1976. Between 1976 and 1986, Bud and the union negotiated four collective bargaining agreements. Each collective bargaining agreement expressly based recognition of the union on the ALRB certification.

On March 31, 1989, the final collective bargaining agreement between Bud and the union expired. Although the company and the union actively negotiated for a new contract, negotiations broke down over the summer. On August 28, 1989, the union went on strike. The company responded by unilaterally implementing its "last and final offer" on September 11, and then locking out the striking employees and hiring replacements nine days later. During this time, the company filed with the state board five sets of unfair labor practice charges against the union. In one instance, it invoked the assistance of the ALRB to obtain a temporary restraining order against what it alleged was unlawful secondary picketing.[3]

The union also filed unfair labor practice charges with the ALRB. The issue before us is whether the state board has jurisdiction to adjudicate these charges. Seven sets of charges are involved. They were filed between September 1, 1989 and June 15, 1990. In those charges, the union alleged that Bud had committed numerous violations of the ALRA over the period from February of 1989 to August of 1990. The bulk of the violations allegedly occurred during the breakdown of negotiations in the summer of 1989.[4] The ALRB began investigating the union's charges, but it did not place them on the same expedited schedule as the company's secondary picketing charges.

On December 18, 1989, the company for the first time raised a question regarding the ALRB's authority in a letter to the ALRB's Regional Field Examiner. Bud invoked NLRB jurisdiction for the first time on January 18, 1990, when it filed unfair labor practice charges with the Board against the union.[5] However, the company did not formally challenge ALRB jurisdiction until April 17, 1990, in a letter to the Salinas ALRB Regional Director. The letter stated that the company had come to realize that "none of the employees working at the Company's cooling facilities can be agricultural employees under the Agricultural Labor Relations Act," because their work was too attenuated from agricultural activity to be exempt from the NLRA.

---

**2.** Approximately thirty to forty thousand acres are involved in these programs, of which only 1,232.44 acres are owned by Bud; the Bud-owned land is leased to various growers.

**3.** All of these charges were subsequently withdrawn or dismissed without further proceedings.

**4.** The charges included allegations that (1) Bud had engaged in surface bargaining from June 6 through August 30, 1989; (2) Bud refused to supply the union with necessary information in March, May and June of 1989; (3) Bud failed to bargain over subcontracting of unit work in February and December of 1989, as well as January of 1990; (4) Bud made unilateral changes in benefit programs in October and November of 1989; (5) Bud implemented its "last and final offer" without impasse on September 11, 1989; (6) Bud illegally locked out union employees on September 20, 1989; and (7) Bud refused to honor the union's unconditional offer to return to work beginning November 15, 1989.

**5.** These charges, like the earlier ALRB charges, alleged that the union had engaged in illegal secondary picketing and bad faith bargaining. The union responded to the charges by claiming that the NLRB lacked jurisdiction. Eventually, Bud's NLRB charges were either withdrawn or settled. However, the Union reserved its challenge to NLRB jurisdiction.

Despite Bud's challenge, the ALRB continued its investigation and prosecution of the union's charges against Bud. The company responded by seeking a remedy in the NLRB. On September 7, 1990, Bud filed a unit clarification petition with the Board. That petition sought a determination that the employees at the company's California cooling facilities were not "agricultural laborers" exempt from the Act. Although the Regional Director initially dismissed this petition, the Board ordered it reinstated and granted the ALRB amicus curiae status in the unit clarification proceeding.[6]

On January 7, 1991, two weeks after the Board reinstated the unit clarification petition, on January 7, 1991, Bud filed a motion with the ALRB to hold the complaint in abeyance pending resolution of the jurisdictional issues currently before the NLRB. The ALRB's Executive Secretary denied this motion three weeks later. Because the NLRB unit clarification proceedings involved only the *current* status of the bargaining unit employees, while the ALRB unfair labor practice proceedings involved the employees' status *as of 1989*, the state board concluded that the actions were not duplicative. The ALRB denied Bud's request for review of the Executive Secretary's decision on March 1, 1991.

Thwarted in its earlier attempts to force the state board to suspend its proceedings, Bud sought relief in federal court. On March 7, 1991, the company filed an amended complaint in the United States District Court for the Southern District of California. This complaint sought declaratory and injunctive relief to prevent the state board from proceeding with the charges against Bud, as well as damages. The company requested a preliminary injunction against the ALRB, but the district court denied this motion on April 11, 1991.

On May 1, 1991, the NLRB Regional Director issued a decision on Bud's unit clarification petition. The Regional Director concluded that, as of the hearing on the petition, the bargaining unit employees were not "ag-

ricultural laborers," and thus were covered by the NLRA. However, the Regional Director specifically declined to make a determination regarding the status of the employees at any time prior to the date of the hearing. She explained her decision with the following footnote 15:

> The clarification made herein is only as of the date of the hearing herein. I specifically decline to make the declaration requested by the Employer–Petitioner as to its status in 1989. The Employer–Petitioner cites no case authority which mandates such a finding by me, and I conclude that it is inappropriate in the present proceeding.
>
> In addition, the record reflects that on November 2, 1989, the ALRB (which was granted *amicus curiae* status in the instant proceeding by the Board's December 24, 1990, Order), issued a Notice of Hearing and Complaint, alleging that the Employer–Petitioner had engaged in certain unfair labor practices under the Agricultural Labor Relations Act of the State of California. Apparently, a hearing before the ALRB was commenced on April 16, 1991, in which the Employer–Petitioner contends that it is not under the ALRB's jurisdiction. The effect of the clarification herein on the proceedings before the ALRB should be determined by the ALRB and the reviewing courts. Thus, the question as to whether the ALRB has jurisdiction to continue prosecution of those charges currently before it is not appropriately addressed herein.

Following the Regional Director's decision, the company sought in the Southern District a temporary restraining order against the ALRB's prosecution of the unfair labor practice proceedings. On May 13, 1991, the district court denied the application. The court stated that the ALRB was "competent to decide the jurisdictional issue." It also noted that the NLRB had failed to exercise its power to seek injunctive relief against the ALRB: "Where the NLRB does not act to protect its own jurisdiction, this court will

---

6. After Bud had filed its unit clarification petition, the state board sought an advisory opinion from the NLRB regarding the status of Bud's cooling employees. Because of the pendency of the unit clarification proceedings, the NLRB denied the request for an advisory opinion.

not interfere with the proper activity of a competent state tribunal." No further proceedings of substance occurred in the Southern District action. On August 28, 1991, the company and the ALRB stipulated to the dismissal of the complaint. The complaint was dismissed without prejudice except to the extent that it was "based on allegations of collusion, improper contact and/or prejudicial conduct" between the ALRB and its General Counsel.

Somewhat tardily, the union filed an unfair labor practice charge with the NLRB on September 6, 1991. This charge raised essentially the same claims as the ALRB charges. The Regional Director refused to issue a complaint, and the Board affirmed that decision. The members concluded that the union's charges were barred by the NLRB's six-month statute of limitation.

However, the ALRB proceedings continued. On December 16, 1991, the ALRB Administrative Law Judge issued a recommended interlocutory decision on the issue of the state board's jurisdiction.[7] The Administrative Law Judge concluded that Bud was a farmer and that its cooling employees were agricultural employees exempt from the NLRA. Thus, he held that the ALRB had jurisdiction to adjudicate the unfair labor practice claims. The ALRB affirmed the Administrative Law Judge's decision, and the California Court of Appeal dismissed Bud's petition for review.

On October 20, 1992, five days after its setback in the state Court of Appeal, Bud again sought immediate federal court review. This time, it filed in the District Court for the Northern District of California. In the Northern District action, which is the one now before us, Bud asserted six causes of action, most of which alleged that NLRA preemption displaced ALRB jurisdiction over the unfair labor practice charges.[8] The complaint sought declaratory and injunctive relief against the pending ALRB proceedings, as well as damages against the individual defendants.[9] Each party soon filed dispositive motions. On November 9, 1992, the ALRB moved to dismiss pursuant to Fed. R.Civ.P. 12(b)(6). On January 8, 1992, Bud sought partial summary judgment on its declaratory and injunctive relief claims. When the ALRB filed its opposition to Bud's partial summary judgment motion, it suggested that the district court treat its motion to dismiss and opposition to partial summary judgment as a cross-motion for summary judgment.

On March 4, 1993, the district court granted the ALRB's motion to dismiss the complaint in its entirety for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Accordingly, the district court dismissed the cross-motions for summary judgment as moot. The court concluded that footnote 15 of the NLRB Regional Director's unit clarification decision "clearly indicated that the proper forum for determining the Bargaining Unit's status in this matter was the ALRB." The district court also concluded that abstention was warranted under the principles of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The court denied the ALRB's request for sanctions under Fed. R.Civ.P. 11.

Bud appealed the district court's dismissal of its complaint, and the ALRB appealed the denial of Rule 11 sanctions. While this appeal was pending, the NLRB granted review of a unit clarification petition regarding another unit of Bud's employees. *Bud Antle, Inc.*, 311 NLRB No. 184 (Aug. 26, 1993). The Board stated that it granted review be-

---

**7.** The state board had earlier bifurcated the proceedings so that the jurisdictional issue would be considered before the merits.

**8.** The complaint raised the following claims: (1) that the NLRA preempted the ALRB's jurisdiction over the unfair labor practice charges; (2) that the court should order the ALRB to apply federal law standards in determining whether workers are "agricultural employees"; (3) that the NLRA preempted the ALRB's remedial authority; (4) that the ALRB had deprived Bud of rights under the NLRA by engaging in ex parte contacts with its General Counsel; (5) that the ALRB had deprived Bud of the constitutional right to due process by engaging in such contacts; and (6) that the ALRB had violated the ALRA by taking jurisdiction of the unfair labor practice proceedings.

**9.** The company also filed a motion for a preliminary injunction, which the district court denied because Bud had failed to demonstrate likely success on the merits.

cause the ALRB's decision that it had jurisdiction over the FFVW's case "create[d] a Federal-state jurisdictional conflict." *Id.* at 1. The Board specifically criticized the analysis employed by the ALRB and stated that it was inconsistent with well-established NLRB precedent. *See id.* at 2.

## II.

### A.

■ Before considering the various procedural and substantive issues raised on this appeal, it is useful to review the basic outlines of NLRA preemption. The courts have developed two distinct doctrines for determining whether the Act preempts state law.[10] So-called *"Machinists* preemption," named for *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), "prohibits state and municipal regulation of areas that have been left ' "to be controlled by the free play of economic forces." ' " *Building & Construction Trades Council v. Associated Builders and Contractors of Massachusetts,* — U.S. —, —, 113 S.Ct. 1190, 1195, 122 L.Ed.2d 565 (1993) (quoting *Machinists,* 427 U.S. at 140, 96 S.Ct. at 2553). So-called *"Garmon* preemption," named for *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), preserves the primary jurisdiction of the NLRB by prohibiting the states from regulating activities that are at least arguably

protected by § 7 of the NLRA or arguably prohibited by § 8 of that statute. *See id.* at 247, 79 S.Ct. at 780–81; *accord Wisconsin Dep't. of Industry v. Gould, Inc.,* 475 U.S. 282, 286, 106 S.Ct. 1057, 1061, 89 L.Ed.2d 223 (1986).

■ This case involves a question of *Garmon* preemption.[11] In a *Garmon* case, we must decide whether a state entity seeks to regulate conduct that is either arguably protected or arguably prohibited by the NLRA. If the conduct arguably falls within the scope of the Act, then the interest in a uniform federal labor policy identified in *Garmon* requires both the states and the federal courts to defer to the exclusive jurisdiction of the NLRB. *See Garmon,* 359 U.S. at 245, 79 S.Ct. at 779–80.[12] However, the *Garmon* court noted two exceptions to its preemption principle. First, the NLRA will not preempt state action which regulates activity of "a merely peripheral concern" to the Act. *Id.* at 243, 79 S.Ct. at 778–79. Second, state action is not preempted "where the regulated conduct touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 244, 79 S.Ct. at 779. With these basic principles established, we now turn to the issues presented by this case.

---

10. The courts have also developed various principles for determining the preemptive effect of § 301 of the Labor–Management Relations Act. That provision is not at issue here, however.

11. Four of the company's six causes of action potentially involve theories other than *Garmon* preemption. We conclude that the district court properly dismissed the company's third and sixth causes of action. However, the district court's dismissal order makes no mention of the fourth and fifth causes of action. Therefore, we remand these two claims to the district court for its consideration.

In its third cause of action, the company seeks a declaration that the ALRB's remedial authority is preempted by the NLRA, as well as an injunction prohibiting the ALRB from imposing any remedy against Bud. To the extent that this claim is based on *Garmon,* the analysis in the body of the opinion applies. However, Bud's brief suggests that *any* remedy imposed by the

ALRB would intrude on the area Congress left to "the free play of economic forces." Although the district court did not explicitly address the issue, Bud's complaint fails to state a *Machinists* claim. But has not alleged that the ALRB has taken *any* remedial action, and it has not shown how any remedy the ALRB is likely to impose would impinge on its right to employ economic weapons.

Finally, the company's sixth cause of action seeks injunctive relief against the ALRB to require the state board to comply with the ALRA. In light of our decision that the ALRB's jurisdiction is preempted, we direct the district court to dismiss this claim as moot.

12. If the Board explicitly decides that an activity is *neither* protected nor prohibited by the NLRA, then the activity can no longer be considered to be arguably protected or prohibited, and there is no *Garmon* preemption. *See id.*

### B.

◼ Initially, we must determine whether the lower federal courts are a proper forum to consider Bud's contention that *Garmon* ousts the state board of jurisdiction. This issue presents a complex question regarding the NLRA's enforcement scheme. Accordingly, we requested the view of the NLRB, the agency with primary responsibility for enforcing the Act. In its amicus submission, the Board expressed its opinion that a private party may bring an action in a federal district court for injunctive relief on the basis of *Garmon* preemption. We agree.

◼ We would ordinarily have little difficulty deciding this issue, for it appears to be the general rule that a private party may seek declaratory and injunctive relief against the enforcement of a state statutory scheme on the ground of federal preemption. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899, n. 14, 77 L.Ed.2d 490 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."). Even in the absence of an explicit statutory provision establishing a cause of action, a private party may ordinarily seek declaratory and injunctive relief against state action on the basis of federal preemption. *See Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 119, 110 S.Ct. 444, 455, 107 L.Ed.2d 420 (1989) (Kennedy, J., dissenting). Indeed, the Supreme Court has upheld a federal district court's grant of injunctive relief against a state on the basis of *Garmon* preemption. *See Wisconsin Dep't. of Industry v. Gould, Inc.,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986); *see also Building & Constr. Trades Council,* —— U.S. at ————————, 113 S.Ct. at 1194–99 (considering *Garmon* action for injunctive relief against a state and rejecting it on the merits). In *Babler Bros., Inc. v. Roberts,* 995 F.2d 911 (9th Cir.1993), we considered a complaint for injunctive relief brought by a private party alleging *Garmon* preemption.

These cases would seem to make it clear that a private party may bring an action in federal court seeking injunctive relief against state action on the basis of *Garmon.* However, language in one of our cases may appear to suggest the contrary. In *Ethridge v. Harbor House Restaurant,* 861 F.2d 1389 (9th Cir.1988), we stated:

> It is also clear that the *Garmon* analysis is not one to be undertaken by the lower federal courts. "A claim of *Garmon* preemption is a claim that the state court has no power to adjudicate the subject matter of the case, and when a claim of *Garmon*-preemption is raised, *it must be considered and resolved by the state court.*" If the state court errs in determining whether *Garmon* principles deprive it of jurisdiction over a dispute, review of that decision may be had in the Supreme Court.

*Id.* at 1399 (citations omitted) (quoting *International Longshoremen's Ass'n v. Davis,* 476 U.S. 380, 393, 106 S.Ct. 1904, 1913, 90 L.Ed.2d 389 (1986)) (emphasis in *Ethridge* ). While it is possible to read this language as suggesting that parties are not free to invoke the power of the lower federal courts to vindicate a claim of *Garmon* preemption, such an interpretation is only partially correct. It is true that a party may not *remove* an action brought in state court simply because a *Garmon* defense is asserted. When such a defense is raised in state court, the state court must resolve it. However, we did not say, and would not have said, that no cases involving *Garmon* preemption may be filed or decided in federal court, or that federal courts were without power to enjoin *Garmon* violations.

Although *Ethridge*'s language may appear at first glance to be all-encompassing, it must be read in context. So read, the *Ethridge* language is not applicable to, and does not control, the present case. Our statements in *Ethridge* were addressed to an entirely different circumstance from the one presented here. *Ethridge* involved a case filed in state court in which *Garmon* preemption was raised as a defense. The defendant sought to remove to federal court what was otherwise a properly filed state-law claim. The holding in *Ethridge* was that the *Garmon*

doctrine does not afford such "complete preemption" as to transform a well-pleaded state-law claim into one arising under federal law simply because the defense of preemption is asserted. In *Ethridge,* we only held that district courts do not have original federal question jurisdiction over state-law claims which are subject to a defense of *Garmon* preemption, *see Ethridge,* 861 F.2d at 1396–1401, and that such claims may not be removed to federal court. For that reason, we said that the state court must decide the *Garmon* question. It was in that context—and that context only—that we stated that "the *Garmon* analysis is not one to be undertaken by the lower federal courts." *Id.* at 1399. In *Ethridge* we were not making any global statement, and we certainly did not intend to decide whether federal courts may enjoin state administrative proceedings that are preempted by *Garmon.*

Our holding in *Ethridge* constituted a simple application of the Supreme Court's decision in *Davis. See id. Davis* did not suggest, and *Ethridge* did not hold, that lower federal courts may *not* consider an action for injunctive relief on *Garmon* ground. It would be startling if the Court that decided *Davis* had made such a suggestion, for in the very same term it upheld precisely such a grant of relief. *See Gould,* 475 U.S. at 286–91, 106 S.Ct. at 1061–64 (upholding an injunction granted by a federal district court at the request of a private party). In short, all that the *Davis* language repeated in *Ethridge* holds is that if a state court action is brought and the defendant asserts *Garmon* preemption, the state court must decide that issue.

Moreover, despite the broad language in *Ethridge,* there are several circumstances in which this "lower federal court" has in fact "undertaken" the *Garmon* analysis. Most obviously, we have done so when a party has raised *Garmon* as a defense to a state-law claim that is properly before the district court (through diversity or supplemental jurisdiction). *See, e.g., Milne Employees Ass'n v. Sun Carriers, Inc.,* 960 F.2d 1401, 1413–18 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993). We have also done so on application of the NLRB, enjoining the enforcement of state

regulations that are preempted by the Board's decision to exercise jurisdiction. *See N.L.R.B. v. California Horse Racing Bd.,* 940 F.2d 536, 539 (9th Cir.1991). Finally, in *Babler Bros.,* a case identical to the present one for these purposes, we considered and decided a private party's action to enjoin enforcement of a state statute on the ground that the statute regulated activity which was arguably protected or prohibited by the NLRA. *See Babler Bros., Inc. v. Roberts,* 995 F.2d 911, 914–15 (9th Cir.1993).

Our statements in *Ethridge* were correct in that case's context of removal. However, if they were read so broadly as to preclude a private party from seeking injunctive relief on *Garmon* ground, they would conflict with *Gould, Babler Bros.,* and the other cases discussed above. Moreover, such a reading would run directly contrary to the basic concern underlying the *Garmon* doctrine: the interest in preserving a uniform national labor policy and protecting employees and employers from local regulation which conflicts with the NLRA's centralized regulatory scheme. As the NLRB has explained in its amicus submission, private parties must be empowered affirmatively to invoke the *Garmon* doctrine on their own behalf. Although the Board has the authority to seek injunctions against state proceedings that conflict with its exercise of jurisdiction, *see, e.g., N.L.R.B. v. Nash–Finch Co.,* 404 U.S. 138, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971); *California Horse Racing Bd.,* 940 F.2d at 539, it lacks the resources to discover every preempted state proceeding and take action against it. We find the NLRB's assessment of its own limitations persuasive:

> In short, it is not practically possible for the Board to police all potential interference with federal labor law by the states. Allowing private parties, who have an interest in not being subject to conflicting rules, to assert that state laws or proceedings are preempted by federal law, would better serve the goal of uniform application of labor laws.

Because it is the only conclusion that is consistent with our case law and the principles underlying the *Garmon* doctrine, we hold that a private party may bring an action

in a federal district court seeking injunctive relief on the basis of *Garmon* preemption.[13]

### C.

Although we have concluded that a private party may bring a suit for injunctive relief to enforce the *Garmon* doctrine, we cannot turn to the merits of Bud's claim yet. Rather, we must decide whether the district court in this case had authority to enjoin the ALRB's ongoing administrative proceedings. In particular, we must determine whether the statutory limitations of the Anti–Injunction Act, 28 U.S.C. § 2283, or the equitable doctrine of *Younger* [14] abstention, bars injunctive relief in this case. We conclude that the Anti–Injunction Act does not prevent federal courts from enjoining state administrative proceedings. We also hold that *Younger* abstention does not apply.

### 1.

■■■ The Anti–Injunction Act, 28 U.S.C. § 2283, provides that:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

This statute does not preclude us from granting the relief Bud seeks. By its plain and unambiguous language, the provision applies only to federal injunctions "to stay proceedings *in a State court*." (emphasis added). The company is not seeking to enjoin proceedings in any "court." Rather, it asks for an injunction against a pending adjudication in a state *administrative agency.* In a footnote in *Gibson v. Berryhill,* 411 U.S. 564, 93

S.Ct. 1689, 36 L.Ed.2d 488 (1973), the Supreme Court stated that it "need not decide" whether the Anti–Injunction Act applies to state administrative proceedings. *Id.* at 573 n. 12, 93 S.Ct. at 1695 n. 12. However, both the text of the statute and its narrow purpose of preventing friction between the state and federal *judiciaries, see Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs.,* 398 U.S. 281, 287, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970), lead to the conclusion that it does not prohibit a federal court from enjoining a state administrative proceeding.

Indeed, every circuit to decide the question has held that the Anti–Injunction Act means what it says: it limits a federal court's power to enjoin "proceedings in a State *court,*" but it does not affect the power to enjoin proceedings in any other entity of state government, such as a state administrative agency. *See Kerr–McGee Chemical Corp. v. City of West Chicago,* 914 F.2d 820, 824 (7th Cir. 1990); *American Motor Sales Corp. v. Runke,* 708 F.2d 202, 204–05 (6th Cir.1983); *Engelman v. Cahn,* 425 F.2d 954, 958 (2d Cir.1970) (Friendly, J.); *Taylor v. Kentucky State Bar Ass'n.,* 424 F.2d 478, 482 (6th Cir.1970); *see also SMA Life Assurance Co. v. Sanchez–Pica,* 960 F.2d 274, 276 (1st Cir. 1992) ("While the Supreme Court has left the issue open, the appellate courts seem to agree that the Act applies only to state courts.") (citation omitted) (citing *Gibson,* 411 U.S. at 573 n. 12, 93 S.Ct. at 1695 n. 12); *Armstrong v. Maple Leaf Apartments, Ltd.,* 508 F.2d 518 (10th Cir.1974) (holding the Anti–Injunction Act inapplicable unless tribunal is "performing a state judicial function"). We agree with these cases and hold that the Anti–Injunction Act does not bar an injunc-

---

**13.** The ALRB argues that, to determine whether a private party has a right of action under the NLRA preemption doctrines, we must apply the four-factor test set forth in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975). While we do not believe it necessary to do so in light of the Supreme Court's decision in *Gould,* we note that the *Cort* factors point in favor of recognizing a private party's right to seek injunctive relief against state action on the basis of *Garmon* preemption. First, parties who face regulation by preempted state tribunals are among those "for whose *especial* benefit" the *Garmon* doctrine was developed. *Id.* Second,

there is no indication of legislative intent either to grant or to deny a private injunctive remedy for NLRA preemption. *See id.* Third, as the NLRB has made clear in its amicus submission, it is fully "consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff." *Id.* Finally, the cause of action—that a federal statute preempts some state action—is obviously not "traditionally relegated to state law." *Id.*

**14.** *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

tion against an ongoing state *administrative* adjudication.

■ Thus, the Anti–Injunction Act is narrower in its application than is the *Younger* abstention doctrine. As discussed more fully in the next section, *Younger* applies even to state administrative proceedings, so long as they are "judicial in nature." *New Orleans Public Serv., Inc. v. Council of New Orleans (NOPSI)*, 491 U.S. 350, 370, 109 S.Ct. 2506, 2519, 105 L.Ed.2d 298 (1989). Yet the conclusion that a state administrative tribunal is "judicial in nature" for purposes of *Younger* abstention does not change the fact that it is still an administrative tribunal—not a "court." Thus, 28 U.S.C. § 2283 still does not apply. *See Erdmann v. Stevens*, 458 F.2d 1205, 1213 n. 3 (2d Cir.1972) (Lumbard, J., concurring) (stating that, while the Anti–Injunction act does not apply to state administrative proceedings, *Younger* abstention does); *Matson Navigation v. Hawaii Pub. Util. Comm'n*, 742 F.Supp. 1468, 1478 (D.Hawaii 1990).

Because Bud seeks to enjoin proceedings in a state administrative agency rather than a state court, we conclude that the Anti–Injunction Act does not provide a bar to relief.

### 2.

■ In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that principles of comity, equity, and federalism ordinarily require federal courts to abstain from enjoining pending state criminal proceedings. Although *Younger* itself dealt only with criminal proceedings, the Court held in *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), that the *Younger* doctrine prohibits injunctions against certain state *administrative* proceedings as well, so long as those proceedings are "judicial in nature." *NOPSI*, 491 U.S. at 370, 109 S.Ct. at 2519. The Court in *Dayton* established a three-part test for determining whether a federal court should abstain. Under this test,

[a]bstention is appropriate in favor of a state proceeding if (1) the state proceedings are ongoing; (2) the proceedings implicate important state interests; and (3) the state proceedings provide an adequate opportunity to raise federal questions.

*Fresh Int'l Corp. v. Agricultural Labor Relations Bd.*, 805 F.2d 1353, 1357–58 (9th Cir. 1986). In applying this test, we must adhere to the basic principle that "abstention from the exercise of federal jurisdiction is considered 'an extraordinary and narrow exception to the duty of a District Court to adjudicate the controversy properly before it.'" *American Int'l Underwriters v. Continental Ins.*, 843 F.2d 1253, 1256 (9th Cir.1988) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)). Accordingly, "the balance must always tip heavily in favor of exercising jurisdiction." *Id.* at 1259–60.

■ We have previously held that ALRB adjudications are "judicial in nature." *Fresh*, 805 F.2d at 1357 n. 3. Thus, the initial prerequisite for the application of the *Younger* doctrine is satisfied. Moreover, this case appears to satisfy the first and third requirements of the test applied in *Dayton Christian Schools* and *Fresh*. The ALRB instituted administrative proceedings in 1989, and these proceedings were ongoing when the company filed this action in federal court in 1992. Thus, "the state proceedings were underway before the federal proceeding was initiated and had moved beyond the 'embryonic stage.'" *Id.* at 1358. In addition, the *Fresh* court held that the procedures for judicial review of ALRB orders in the California courts provide an adequate opportunity to raise claims of federal preemption. *See id.* at 1362. The record here indicates that the ALRB has fully (although erroneously) considered Bud's preemption claim as well.

However, the ongoing state proceedings do not implicate any important state interest, because the NLRA clearly preempts the state board's jurisdiction. Although we held in *Fresh* that ALRB proceedings further an important state interest in protecting the collective bargaining rights of agricultural laborers, *see id.* at 1358–62, we also noted that when it is clear that "the state tribunal is acting beyond the lawful limits of its au-

thority," there is "no principle of comity or of 'our federalism'" that abstention would serve. *Id.* at 1361 n. 11 (quoting *Baggett v. Department of Professional Registration,* 717 F.2d 521, 524 (11th Cir.1983)). Because "[n]o significant state interest is served where the state law is preempted by federal law and that preemption is 'readily apparent,'" we will not apply *Younger* abstention in a case of clear preemption. *Gartrell Construction, Inc. v. Aubry,* 940 F.2d 437, 441 (9th Cir.1991) (citing *Champion Int'l Corp. v. Brown,* 731 F.2d 1406 (9th Cir.1984)).

As we explain in detail below, under the *Garmon* doctrine it is "readily apparent" that the ALRB is acting beyond its jurisdiction, for it is "readily apparent" that the employees in the bargaining unit at issue are at least "arguably" covered by the BLRA. In two separate unit clarification decisions, the NLRB has clearly expressed its view that the disputed operation falls under the jurisdiction of the Board. One of these decisions involved a different bargaining unit from the one involved in the present case, but the same company and issue. The other involved the same bargaining unit as is involved here, but a different date.[15] The ALRB does not even allege that the NLRB would reach a different conclusion if it considered whether it had jurisdiction over the instant bargaining unit as of 1989. Rather, the state board merely argues that the two NLRB decisions incorrectly applied the law. As we explain below, this argument misconstrues *Garmon.* It does not detract from the clear conclusion that the ALRB's jurisdiction is preempted, for there is no doubt that the two unit clarification decisions make it at least "arguable" that the bargaining unit was covered by the NLRA.[16] Because it is "readily apparent" that the *Garmon* doctrine

ousts the ALRB of jurisdiction, we conclude that *Younger* abstention is inappropriate.

**D.**

■ Because we have concluded that Bud could properly maintain this action and that the district court erred in abstaining, we must now consider the merits of Bud's *Garmon* claim. We hold that the state board's proceeding seeks to regulate activity which is arguably protected or arguably prohibited by the NLRA. Accordingly, that proceeding is preempted.

**1.**

There is no doubt that, if the bargaining unit employees are covered by the NLRA, the conduct the state board seeks to regulate is at least arguably protected or prohibited under the Act. In the complaint filed on December 21, 1990, the ALRB's General Counsel alleged that Bud had failed to bargain in good faith, unlawfully subcontracted out work, unlawfully implemented its last offer, and refused to reinstate employees who abandoned the strike, among other violations. Neither party disputes that all of these actions are at least arguably unfair labor practices under §§ 8(a)(1), (3), and (5) of the NLRA. *See* 29 U.S.C. §§ 158(a)(1), (3), & (5). Indeed, the ALRB brought its complaint pursuant to the unfair labor practice provisions of the ALRA, which are almost identical to those in the NLRA. *See* Cal.Labor Code §§ 1153(a), (c), & (e).

However, there is a question whether the NLRA applies to the relationship between Bud and the union—or, to put it more concretely, to the particular employees at issue. The Act applies only to bargaining units composed of "employees" as defined in § 2(3). *See* 29 U.S.C. § 152(3). That section specifi-

---

15. The NLRB had decided only one of these two unit clarification petitions at the time the district court issued its disposition. However, we are required to apply the law as it exists at the time of our decision. *See The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801).

16. In response to our inquiry, the NLRB replied that it believed that abstention would be appropriate regardless of the merits of Bud's preemption claim. (It expressed no view on the merits of the preemption issue.) The Board reasoned

that the preemption issue in this case turns on whether the particular workers in the bargaining unit are "employees" under the Act, and that this determination is "at bottom a factual inquiry." *NOPSI,* 491 U.S. at 367, 109 S.Ct. at 2518. However, the preemption issue in this case requires *no* further factual inquiry. The NLRB's decisions in cases involving the same company, issue, and unit make it clear by themselves that the ALRB's jurisdiction over the bargaining unit is preempted.

cally provides that "[t]he term 'employee' . . . shall not include any individual employed as an agricultural laborer." *Id.* If Bud's employees are "agricultural laborers," then the NLRA does not apply, and the company's conduct is not arguably prohibited under the Act. However, if Bud's employees are *not* agricultural employees, then the company's conduct is at least arguably prohibited by the NLRA. Even if Bud's workers are only *arguably* not agricultural laborers, the company's conduct is at least arguably prohibited. As the Supreme Court held in a similar context (dealing with the supervisorial rather than the agricultural exemption), we must determine whether the workers in question are arguably "employees." If the workers are arguably "employees," then the state adjudication is preempted. *See International Longshoremen's Ass'n v. Davis,* 476 U.S. 380, 394, 106 S.Ct. 1904, 1914, 90 L.Ed.2d 389 (1986) ("We should inquire, then, whether Davis was arguably an employee, rather than a supervisor. If he was, the issue was to be initially decided by the NLRB, not the state courts."). Thus, the question before us is whether Bud's workers are arguably "employees" rather than "agricultural laborers." We conclude that the workers were at least arguably "employees," and that the *Garmon* test is therefore satisfied.

The NLRA does not define the term "agricultural laborer." Every year since 1946, however, Congress has attached to the NLRB appropriations bill a rider which requires the Board to follow the definition of "agriculture" set forth in § 3(f) of the Fair Labor Standards Act ("FLSA").[17] *See, e.g., Bayside Enterprises v. N.L.R.B.,* 429 U.S. 298, 300 n. 6, 97 S.Ct. 576, 578, n. 6, 50 L.Ed.2d 494 (1977); *Camsco Produce Co.,* 1989–90 CCH NLRB ¶ 15,989 at 30,082 (1990). As the Supreme Court explained in *Bayside,* the definition in § 3(f) "includes farming in both a primary and a secondary

sense." 429 U.S. at 300, 97 S.Ct. at 579. In its primary sense, the term "refers to actual farming operations," including functions such as "cultivation, tilling, growing, and harvesting of agricultural commodities." *Camsco,* 1989–90 CCH NLRB at 30,082. In its secondary sense, the term "includes any practices which are performed by a farmer or on a farm as an incident to or in conjunction with such farming operations." *Id.*

Applying these definitions, it is at least arguable that Bud's cooling employees are not "agricultural laborers." The bargaining unit employees clearly do not engage in agricultural activities in the primary sense— rather, they work at cooling facilities and perform tasks such as operating and maintaining cooling machines, storing produce, and loading and unloading trucks. Moreover, the workers arguably do not engage in secondary agricultural operations either. Because the workers do not work "on a farm," NLRB precedent requires them to satisfy two criteria in order to be categorized as agricultural laborers: Bud must be a "farmer," and the workers must perform tasks which are incidental to or in conjunction with *Bud*'s farming operations. *See Camsco, supra; Employer Members of Grower–Shipper Vegetable Ass'n,* 1977–78 CCH NLRB ¶ 18,386 at 30,525–26 (1977). Bud fails both of these requirements; however, we need only discuss the first.

It is at least arguable that Bud was not a "farmer" at the time of the events giving rise to the ALRB unfair labor practice charges. As of 1989, Bud grew very little of its own produce; indeed, it grew its last crop in that year. Rather than grow its own crops, Bud acquired crops primarily (and now exclusively) through a variety of contracting-out arrangements. Under these arrangements, growers raised the crops on their own land and were generally responsible for tending to

**17.** Section 3(f) provides
"Agriculture" includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.
29 U.S.C. § 203(f).

them. Bud was responsible for harvesting the crops, and the company generally oversaw the growing process. The Board has held that a company which acquires its produce exclusively through similar contracting-out arrangements is not a "farmer." *See Employer Members*, 1977–78 CCH NLRB at 30,526.[18] Indeed, in a decision subsequently affirmed by the full NLRB, the Regional Director concluded that, as of 1991, Bud was not a "farmer." The Regional Director relied on the fact that "the actual cultivation of the crops is performed by the growers, and that the growers retain the risk and the responsibility for the crops until they are harvested."

The Regional Director's decision, as well as the similarity of Bud's contracting-out arrangements to those the Board held insufficient to confer "farmer" status in *Employer Members*, requires us to conclude that Bud was at least arguably not a "farmer" as of 1989. Although the ALRB concluded that Bud was a "farmer" on that date, it did not present any reason to distinguish Bud's operations as of 1989 from its operations as of 1991. Instead, it took issue with the legal standard applied by the NLRB in the unit clarification proceedings. In reaching its conclusion, the ALRB employed a "single integrated enterprise" analysis—which has traditionally been applied *outside* of the agricultural context. Applying this analysis, the ALRB concluded that Bud did not act at arm's length from its contractor-growers, and therefore that Bud and its growers must be treated as a single enterprise. Yet, as the state board's ALJ acknowledged, "the NLRB has taken a different approach in dealing with agriculture." In a proceeding subsequent to the ALRB's decision on jurisdiction, the NLRB specifically criticized the state board for failing to follow established NLRB

precedents. *Bud Antle, Inc.*, 311 NLRB No. 184 (August 26, 1993).[19]

The Board's consistent interpretation of the statute, and its conclusion that Bud is not a farmer under this interpretation, make it at least arguable that the bargaining unit employees are not agricultural laborers. The Supreme Court in *Bayside* held that the courts must defer to the NLRB's interpretations of the "agricultural laborer" exemption "even if the issue might 'with nearly equal reason be resolved one way rather than another.'" 429 U.S. at 302, 97 S.Ct. at 580 (citation omitted). The *Bayside* court rested this holding on the NLRB's "special duty [which] is to apply this broad statutory language to varying fact patterns." *Id.* at 304, 97 S.Ct. at 581. The state board's ALJ distinguished *Bayside*, however, on the ground that:

> This is a situation where a State administrative agency—with its own statutory mandate, its own expertise, and its own "special duty to apply broad statutory language to varying fact patterns"—has entered into the picture and asserted jurisdiction. In other words, the issue here is one of Federalism, and issues of federalism are to be resolved, not by simply deferring—as the Court did in *Bayside*—to the federal agency, but by careful, independent scrutiny of both the federal and the state statutory schemes to determine whether there is a necessary conflict.

We reject the ALRB's distinction. The ALJ's analysis is completely inconsistent with *Garmon*. *Garmon* preempts state jurisdiction over activity that is *arguably* protected or prohibited by the NLRA precisely in order to allow the *NLRB* to make the determination in the first instance and to ensure that "the danger of state interference with national policy is to be averted." *Gar-*

---

18. Although *Camsco* overruled *Employer Members* in part, it left intact the portion of *Employer Members* which elaborated on the definition of "farmer."

19. The Board stated:
 As the state administrative law judge acknowledged in his decision, the Board has historically applied a different analysis in these types of cases, following FLSA regulations rather than applying the traditional single-employer analy-

sis; has consistently found in prior cases that contract growers are in fact independent under that analysis; and the Supreme Court in [*Bayside*] appeared to uphold the Board's policy in this regard, citing with approval [*Norton & McElroy Produce*, 133 NLRB 104 (1961),] a case which is factually very close to the instant case.

*Id.* at 2 (citations and footnote omitted).

**1276**

*mon*, 359 U.S. at 245, 79 S.Ct. at 780. As the *Garmon* Court explained, "It is essential that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board." *Id.* at 244–45, 79 S.Ct. at 779. The Board's interpretations of the NLRA, and its decisions in the related unit clarification proceedings, make it at least arguable that the workers in the bargaining unit were *not* agricultural laborers.

2.

In light of the above, it seems clear that the ALRB is seeking to regulate activity which is at least arguably protected or prohibited by the NLRA. The state board does not assert that either of *Garmon*'s two exceptions apply in this case.[20] Rather, it argues only that the NLRB somehow vested the state board with jurisdiction to resolve the unfair labor practice charges that form the basis of this case. It presents two theories. First, the ALRB argues that the NLRB's Regional Director ceded jurisdiction to the state board when she made certain statements in refusing to apply her unit clarification decision retroactively. Second, the state board contends that the Board declined jurisdiction over the Bud dispute pursuant to NLRA § 14(c) and that this action vested the ALRB with jurisdiction under that provision. We reject both of these theories.

The ALRB argues that, in the course of her decision that the bargaining unit employees were covered by the NLRA, the Regional Director made an authoritative determination that the state board has jurisdiction over this dispute. It claims that Bud's action in the district court is merely an artfully-pleaded attempt to evade the general rule that there is no direct judicial review of unit clarification decisions. The ALRB's argument focus-

es on footnote 15 of the Regional Director's decision, which stated that her role under the NLRA was merely to determine whether the unit sought was an appropriate unit under the Act and that the decision would therefore determine the facts and the law as of the hearing date. Thus, she said, her decision would have prospective effect only. The Regional Director went on to say that "[t]he effect of the clarification herein on the proceedings before the ALRB should be determined in that proceeding by the ALRB and the reviewing courts." It is this last remark the ALRB seizes upon.

We conclude that the Regional Director's statement does not render *Garmon*'s "arguably protected/arguably prohibited" analysis inapplicable in this case. Nothing in the Regional Director's decision indicates that she believed she had the authority to decide, or that she intended to decide, whether the ALRB or a federal court would be the appropriate forum in which to decide the question of the ALRB's jurisdiction in 1989, should that question be raised at some future date before a federal court. Nor did the Regional Director hold that the ALRB had exclusive, or any, jurisdiction to determine definitively whether *Garmon* preempted the earlier state proceedings against Bud. Rather, she merely stated that the issue of ALRB jurisdiction as of 1989 was not properly before her: "the question as to whether the ALRB has jurisdiction to continue prosecution of those charges currently before it is not appropriately addressed herein." She also observed that the 1989 problem remained where it was, before the ALRB, and that a hearing was there in progress. Therefore, she assumed, properly, that the ALRB would be required to decide the 1991 jurisdictional question first and that court review would follow. In any event, even if the Regional Director had the authority to refer the *Garmon* issue to the ALRB, it is apparent that she did not do so here.

---

**20.** In any event, we believe that the two exceptions would be inapplicable here. The types of unfair labor practices Bud is alleged to have committed are a central, rather than merely peripheral, concern of the NLRA. Moreover, even if there is a strong state interest in regulating agricultural labor relations in general, that inter-

est is hardly so strong as to require us to conclude that it extends to the farthest conceivable limits—to off-the-farm work performed for non-farmers. To the contrary, in such cases, the strong policies of federal preemption are dominant.

Moreover, although *Garmon* preemption does not apply when the Board has determined "'with unclouded legal significance'" that a particular activity is neither protected nor prohibited by the Act, *Hanna Mining Co. v. Marine Engineers Beneficial Ass'n*, 382 U.S. 181, 190, 86 S.Ct. 327, 332, 15 L.Ed.2d 254 (1965) (quoting *Garmon*, 359 U.S. at 246, 79 S.Ct. at 780). The Regional Director's footnote did not constitute a determination of the merits of the preemption issue at all. It did not purport to state that Bud's alleged unfair labor practices were neither protected nor prohibited by the Act. As we have just explained, it merely stated that the issue of whether the bargaining unit was covered by the Act in 1989 was one that was not appropriately addressed in the particular unit clarification petition before it. The Regional Director averred that she could find no authority which allowed her to make any determination other than the one which is the primary object of a unit clarification proceeding: the determination of the legality or boundaries of a prospective bargaining unit. Thus, she found it "inappropriate" to consider any question regarding jurisdiction or coverage for periods prior to the hearing.

The Regional Director's statements in this case do not even come close to the NLRB actions the *Hanna Mining* Court found sufficient to have resolved the preemption question "with unclouded legal significance." In *Hanna Mining*, the Regional Director dismissed the employer's petition for a representation election on the stated ground that the unit employees were "supervisors" and thus not "employees." The Board affirmed the Regional Director's decision and gave

precisely the same reason he had given. In addition, on two subsequent occasions the company filed unfair labor practice charges which the Regional Director (again affirmed by the Board) dismissed on the ground that the employees in question were "supervisors" and thus outside the coverage of the Act. Here, by contrast, the Regional Director expressly refused to consider whether the employees were covered as of the date of the alleged unfair labor practices because this issue was not before her; nevertheless, she strongly suggested that the Act did reach the company's conduct. Moreover, the Board here has *expressly disapproved* the analysis employed by the ALRB in its interim decision on jurisdiction. If anything has been determined by the NLRB with "unclouded significance," it is that the ALRB does not have jurisdiction over the bargaining unit.[21]

The ALRB also argues that footnote 15 of the Regional Director's decision constitutes a "declination of jurisdiction" under section 14(c) of the NLRA. Such a declination would allow the state board to assert jurisdiction.[22] However, the footnote did not constitute a declination of NLRB jurisdiction. The Regional Director had no "jurisdiction" to resolve the earlier dispute in the clarification proceeding, so she had no "jurisdiction" to decline. The only matter properly before her in the unit clarification proceeding was the status of the bargaining unit as of the date of the hearing. Her decision did not in any way prevent, or purport to prevent, the NLRB from asserting jurisdiction over unfair labor practice charges based on the 1989 events. Indeed, when the union *did* bring

---

21. Although § 10(a) of the NLRA, 29 U.S.C. § 160(a), allows the Board "by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases," the record reflects no such agreement in this case, and the Regional Director's footnote cannot be taken as such an agreement. It was simply an explanation why the Regional Director did not address the pre-hearing status of the parties, as well as a prediction of which forum would decide that issue.

22. Section 14(c) states:
 (1) The Board, in its discretion, may, by rule of decision or by published rules adopted pursuant to the Administrative Procedure Act, decline to assert jurisdiction over any labor dis-

pute involving any class or category of employers where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction: Provided, that the Board shall not decline to assert jurisdiction over any labor dispute over which it would assert jurisdiction under the standards prevailing upon August 1, 1959.
 (2) Nothing in this Act shall be deemed to prevent or bar any agency or the courts of any State or Territory ... from asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction.
29 U.S.C. § 164(c).

NLRB charges based on these events, after the Board affirmed the Regional Director's decision, the General Counsel dismissed them on *statute of limitation* rather than on the jurisdictional ground. Because the Regional Director's footnote did not have any effect on the Board's jurisdiction over the 1989 dispute, it was not a "declination of jurisdiction."

 An ambiguous footnote in an individual unit clarification proceeding is not the type of action which § 14(c) contemplates as constituting a "declination of jurisdiction" which can override the NLRA's preemptive effect. That provision speaks of NLRB decisions to abstain from entire categories of cases, rather than individual cases. It allows the Board to "decline to assert jurisdiction over any labor dispute *involving any class or category of employers,* where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction." 29 U.S.C. § 164(c)(1) (emphasis added). Had Congress intended § 14(c) to apply to decisions not to exercise jurisdiction in *particular cases,* it could have ended the prepositional phrase with "labor dispute." The inclusion of the language referring to classes or categories of employers suggests that § 14(c) refers to a more categorical determination than the one the Regional Director assertedly made here. Our cases decided under that section make clear that the provision refers to categorical rather than individual decisions not to exercise jurisdiction. *See, e.g., N.L.R.B. v. Cofer,* 637 F.2d 1309, 1312 (9th Cir.1981) ("Pursuant to this grant of discretion [§ 14(c)], the Board has established a jurisdictional yardstick for the hotel industry of $500,000 of annual gross income."); *N.L.R.B. v. Children's Baptist Home,* 576 F.2d 256, 258 n. 1 (9th Cir.1978) (stating that "the Board has adopted the policy of setting 'discretionary jurisdiction' standards which are expressed as a dollar amount of business volume" and that Congress had "expressly approved" this policy in § 14(c)(1)). Because the Regional Director's footnote was an individual rather than a categorical decision, it

was not a declination of jurisdiction under NLRA § 14(c).

### III.

The ALRB's unfair labor practice proceedings against Bud clearly seek to regulate conduct which is arguably protected or prohibited under the NLRA. Because the state board is incorrect in its assertion that the NLRB ceded jurisdiction over Bud's dispute with the union, we conclude that the district court erred in denying the company's *Garmon* claim. Because preemption in this case is readily apparent, we also conclude that the district court erred in abstaining pursuant to the *Younger* doctrine. Accordingly, Bud is entitled to injunctive relief. Except as set forth in footnote 11, *supra,* we reverse the judgment of the district court.[23]

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

**23.** In light of our resolution of the principal issues in this case, we also hold that the district

court did not abuse its discretion in denying the ALRB's request for Rule 11 sanctions.