## NATIONAL AUDUBON SOCIETY et al., Plaintiffs,

v.

## Gray DAVIS et al., Defendants,

and

## Protect Pets and Wildlife/Vote Yes on Proposition 4, et al., Defendant–Intervenors.

## Dan Glickman et al., Necessary Parties

## National Trappers Association Inc. et al., Plaintiff–Intervenors,

v.

## Gray Davis et al., Defendants,

and

## Protect Pets and Wildlife/Vote Yes on Proposition 4, et al., Defendant–Intervenors.

### No. C–98–4610–CAL.

United States District Court, N.D. California.

Nov. 30, 2000.

Laurens H. Silver, California Environmental Law Project, Mill Valley, CA, Kelly L. Drumm, California Environmental Law

Project, San Francisco, CA, John McCaull, National Audubon Society, Sacramento, CA, for National Audubon Society, Inc., Golden Gate Audubon Society, Inc., Marin Audubon Society, Inc., Muir Beach Enviro, Inc., California Waterfowl Association, Inc.

Francis M. Goldsberry, II, Goldsberry Freeman & Swanson, LLP, Sacramento, CA, Eric R. Glitzenstein, Meyer & Glitzenstein, Washington, DC, for Protect Pets and Wildlife/Vote Yes on Proposition 4, American Soc. for the Prevention of Cruelty to Animals, Animal Protection Institute, The Ark Trust, Inc., Doris Day Animal League, The Fund for Animals, The Humane Soc. of the U.S., The Intern. Fund for Animal Welfare.

Clifford T. Lee, CA State Attorney General's Office, San Francisco, CA, for Pete Wilson, Douglas Wheeler, Jacqueline E. Schafer, California Department of Fish & Game, California Fish & Game Commission.

Charles M. O'Connor, U.S. Attorney's Office Environmental & Natural Resources Unit, San Fancisco, CA, Paul J. Boudreaux, Enviromental & Natural Resources Section, Wildlife & Marine Resources Section, U.S. Dept. of Justice, Washington, DC, for Dan Glickman, Gary Simmons, Bruce Babbit, Jamie Rappaport Clark, Anne Badgley, Robert Stanton.

Richard D. Gann, Marvin Morrow & Hunlock, LLP, San Diego, CA, George Hunlock, John Staley, Marvin Morrow & Hunlock, LLP, San Diego, CA, for National Trappers Ass'n Inc., California Trappers' Ass'n, Inc, Tim Wion, Christopher S. Brennan, Loyd E. Horn.

## ORDER ON MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

LEGGE, District Judge.

This action arises from the passage by California voters of Proposition 4 on November 3, 1998. Proposition 4 enacted California Fish & Game Code § 3003.1 which, broadly speaking, bans the use of certain traps and poisons to capture or kill wildlife in the state.

Five different groups of parties are now involved in this litigation over Proposition 4: The National Audubon Society and other groups with similar interests ("plaintiffs") brought this lawsuit against various California state officials and agencies (the "state defendants"). Plaintiffs contend that the new statute jeopardizes programs carried out by the federal government for the control of mammals, and that it will hence be detrimental to bird life. The original complaint also names several federal officials as necessary parties (the "federal parties"). The sponsors and other supporters of Proposition 4 intervened (the "sponsors"). Finally, the National Trappers Association and other groups and individuals with similar interests (the "trappers") intervened and filed a separate complaint.

The following motions are now before the court: Plaintiffs move for leave to amend their complaint, and also move for summary judgment on their complaint as amended. In turn, the state defendants and the sponsors oppose the motion to amend, and have each moved for summary judgment. The federal parties have filed responses to those various motions. The state defendants and the sponsors also move to dismiss the third amended complaint of the trappers.

All of the motions have been briefed, argued and submitted for decision. The court has reviewed the moving and opposing papers, the records submitted by the parties on their motions, the record of the case, and the applicable authorities. Because these motions present interrelated issues, the court concludes that they are best addressed in this single, comprehen-

sive order. And it is important to note that all of the parties *agree* that Proposition 4 cannot be applied so as to preclude trapping activities by agencies of the federal government.

### I.

■ Plaintiffs' motion to amend their complaint is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which provides that at this stage of the case a party may amend "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." The rule expresses a policy favoring the determination of cases on their merits, and thus leave to amend is freely given unless the opposing party shows bad faith, undue prejudice, or a dilatory motive by the moving parties. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *FilmTec Corp. v. Hydranautics,* 67 F.3d 931, 935 (Fed.Cir.1995); *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 186 (9th Cir.1987). In addition, "Amendments seeking to add claims are to be granted more freely than amendments adding parties." *Union Pac. R.R. Co. v. Nevada Power Co.,* 950 F.2d 1429, 1432 (9th Cir.1991).

The motions to dismiss the trappers' complaint are governed by Rule 12(b)(6) of the Federal Rules of Civil Procedure, pursuant to which the court must accept all allegations of material fact stated in the complaint as true, and construe the allegations in a light most favorable to them. *See Love v. United States,* 915 F.2d 1242, 1245 (9th Cir.1989). The complaint will not be dismissed unless it appears that the trappers can prove no set of facts in support of their claims that would entitle them to relief. *See Wyler Summit Partnership v. Turner Broadcasting System, Inc.,* 135 F.3d 658, 661 (9th Cir.1998).

The motions for summary judgment on plaintiffs' complaint are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides that a motion for summary judgment may be granted if there is no genuine issue of material fact. The parties have not identified any material factual disputes —— indeed, they assert that there are none —— so the court resolves the issues presented by those motions as ones of law.

### II.

### A.

Plaintiffs are five non-profit organizations and their members, led by the National Audubon Society, who support the protection and conservation of bird life that is threatened with habitat loss or extinction. It is uncontested that plaintiffs' members use wetlands throughout the United States, California, and the San Francisco Bay Area, for bird and wildlife observation, nature photography, aesthetic enjoyment, and other scientific, educational and recreational activities (including hunting in the case of plaintiff California Waterfowl Association). Some members also help to manage and finance related conservation efforts.

Proposition 4 outlaws the use of certain poisons and traps to capture or kill mammals. Specifically, it adds new Fish and Game Code provisions, one of which states that:

> [I]t is unlawful for any person, including employees of the federal, state, county or municipal government to use or authorize the use of any leg-hold trap, padded or otherwise, to capture any game mammal, furbearing mammal, non-game mammal, protected mammal, or any dog or cat.

Cal. Fish & Game Code § 3003.1(c). There is only one stated exception to this blanket prohibition; the code section does not apply to

federal, state, county, or municipal government employees or their duly authorized agents in the extraordinary case where the otherwise prohibited padded-jaw leg-hold trap *is the only method available to protect human health or safety.*

*Id.* (emphasis added).

Subsection 3003.1(c) is the only part of Proposition 4 that is challenged by plaintiffs. Their underlying concern is that if fewer predator mammals are trapped, more will prey on bird life.

The court notes the unusual positions of the parties in this environmental litigation. Most such litigation pits environmentalists against industry or government. Here we have an unusual alignment of birds versus mammals. That is, two competing groups of environmentalists are in court to protect their respective wildlife constituents against one another.

## B.

Proposition 4 also bans the use of body-gripping traps "for the purposes of recreation or commerce in fur." Cal. Fish & Game Code § 3003.1(a). And it further bans the purchase, sale, or exchange of raw fur from animals trapped in California using body-gripping traps. Cal. Fish & Game Code § 3003.1(b). The trappers are allegedly affected by those sections of the new law. Prior to the passage of Proposition 4, the trappers and their members engaged in trapping for recreation, for interstate commerce in fur, or to protect private property and endangered animals. Their activities included trapping conducted under contracts with state, local, and federal governments, in the protection of everything from levees, to livestock, to the California least tern.

## C.

Two days after the passage of Proposition 4, the California Department of Fish and Game ("DFG") issued a press release that described the impact of Proposition 4. It announced that the new law "makes it generally illegal to trap fur-bearing and non-game animals with commonly used traps and to buy, sell, or exchange the fur of mammals that have been captured with these traps." The press release further stated that,

> DFG and other governmental agencies will now have to use traps other than leg-hold traps to control predators, including those that prey on threatened and endangered species in California. Individuals affected by Proposition 4 should follow its provisions where they actually conflict with existing regulations on trapping.

In response, many individuals stopped using leg-hold traps, including individual trapper plaintiffs and other members of the trapper organizations.

Since that press release two years ago, the DFG has made no further public announcements regarding its enforcement of Proposition 4. Just one individual has been arrested and prosecuted.[1]

## D.

Various federal agencies have also used leghold traps in California, including the U.S. Fish and Wildlife Service (part of the

---

1. The court takes judicial notice of state court records indicating that on March 23, 2000, Daniel Genaro was convicted in Shasta County Superior Court of misdemeanor violations of Fish and Game Code § 3003.1. Mr. Genaro apparently trapped five beavers with a snare trap near an apartment complex in Redding, California, at the request of the building manager. Mr. Genaro appears not to have raised the constitutionality of the law as a defense, beyond Mr. Genaro's statement that trapping is "part of his life-style and his religion." *People v. Genaro,* Case No. 99M1766 (Cal. Sup.Ct. Shasta County, March 23, 2000).

U.S. Department of the Interior), and the U.S. Department of Agriculture, Animal and Plant Health Inspection Service (USDA/APHIS). Prior to the passage of Proposition 4, leghold traps were used throughout California by the federal agencies to protect livestock and other private property pursuant to the Animal Damage Control Act, 7 U.S.C.A. §§ 426–426c. Leghold traps were also used to protect threatened or endangered species from predators, pursuant to the Endangered Species Act, 16 U.S.C.A. §§ 1531 et seq. And they were used to protect a variety of bird species pursuant to the Migratory Bird Act, 16 U.S.C. §§ 702 et seq. Within the National Wildlife Refuge System, trapping also took place under the authority of the Wildlife Refuge System Improvement Act, 16 U.S.C. § 668dd. Specific federal conservation activities included leghold trapping to capture non-native red foxes in the San Francisco Bay National Wildlife Refuge from 1994–97, and to capture muskrats at the Klamath Basin National Wildlife Refuge Complex on an ongoing basis.[2] In both situations, the federal authorities believe that leghold traps are uniquely effective.

During the initiative campaign for Proposition 4, the Department of Agriculture took a strong position against it, even contributing to the ballot argument against the initiative. After the passage of Proposition 4, the federal agencies that used leghold traps in California responded in different ways. The U.S. Fish and Wildlife Service, relying on federal legal authority, decided to continue its leghold trapping program. The USDA/APHIS program decided not to use leghold traps in light of the possibility of criminal enforcement. Throughout November and December 1998, immediately after Proposition 4 was passed, USDA/APHIS removed all of its traps and declared its intention not to place traps when it might otherwise have done so.

## III.

This court issued a temporary restraining order on January 8, 1999 and a preliminary declaratory order on February 3, 1999. The preliminary declaratory order stated that Proposition 4

[W]as not intended to apply, and does not apply, to the use of padded leg-hold traps on federal or nonfederal land by a federal employee, a contractor of a federal agency, or a person acting pursuant to the authority or direction of a federal agency, for the purpose of conserving an endangered or threatened species under the Endangered Species Act . . . .

The parties then before this court (the trappers had not yet intervened) agreed to that result, although they disagreed over its scope and legal bases.

Shortly after the preliminary order, USDA/APHIS put back in place those traps that had been used to protect federally listed threatened and endangered species at wildlife refuges in California.

## IV.

The court first addresses the trappers' complaint, because it makes the broadest attack on Proposition 4.

The trappers moved to intervene in this action. The court granted the intervention and directed them to file a separate complaint. They did so, challenging Proposition 4 as allegedly: violating the commerce clause, being vague under the due process clause, and being preempted by the Endangered Species Act. The court dismissed that complaint, finding that the trappers lacked standing to bring their claims, that they had failed to show a "clearly exces-

---

**2.** Those areas are used by individual plaintiffs and members of the plaintiff organizations.

sive" burden on interstate commerce, and that they had not sufficiently alleged the vagueness of the statute as applied to them. The court also dismissed the first amended complaint. A second amended complaint was filed, and then amended once more by stipulation. Thus the court now has before it the trappers' Third Amended Complaint (TAC), and the motions by the state defendants and the sponsors to dismiss it under Rule 12(b)(6).

■ The TAC contains seven wide-ranging causes of action. In the order they appear in the TAC, they allege: (1) denial of due process because of the alleged unconstitutional vagueness of the statute as applied to the trappers; (2) interference with interstate commerce in violation of the commerce clause; (3) preemption by the federal Endangered Species Act; (4) a declaration that Proposition 4 is unconstitutional; (5) a declaration that Proposition 4 does not apply to certain types of trapping activities; (6) denial of due process because of the dilution of the trappers' votes by allegedly vague information contained in the voter pamphlet; and (7) preemption by the federal Animal Damage Control Act. The trappers seek only injunctive and declaratory relief.

The motions to dismiss raise several issues.

### A. Standing

Problems of standing and ripeness were present in the earlier complaints filed by the trappers. While the TAC adds some new claims, the underlying problems remain. The trappers acknowledge that with regard to many of the facts that might support standing, they "are unable to strengthen [their] allegations at this time." Third Amnd. Compl. at 6 n. 1.

■ To demonstrate that they have the standing to bring a constitutional claim, the trappers have the burden of showing an actual or threatened injury, suffered as a result of allegedly illegal conduct by the defendants, which can fairly be traced to the challenged action and is likely to be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1353 (9th Cir. 1994). As the Ninth Circuit very recently noted, the "injury in fact" prong of the standing analysis frequently coincides with the issue of ripeness where, as here, parties seek review of a statute that has not actually been enforced against them. *See Thomas v. Anchorage Equal Rights Commission,* 220 F.3d 1134, 1138–39 (9th Cir. 2000, hearing en banc granted).

■ The trappers must show a "concrete and particularized" injury-in-fact that is "actual or imminent." *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. Moreover, because they seek only declaratory and injunctive relief, the trappers must also demonstrate a "very significant possibility of future harm." See *San Diego County Gun Rights Comm. v. Reno,* 98 F.3d 1121, 1126 (9th Cir.1996), (citing *Bras v. California Pub. Util. Comm'n,* 59 F.3d 869, 873 (9th Cir.1995); *see Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)).

Depending on the cause of action being addressed, the trappers assert standing based on: the existence of § 3003.1 itself, the threat of prosecution under that statute, economic injury, and dilution of voting rights.

■ The mere existence of § 3003.1 is not sufficient to confer standing, even though the trappers claim that they have limited their activities in response to that statute. "The mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III." *See Stoianoff v. Montana,* 695 F.2d 1214, 1223 (9th Cir.1983).

 The trappers also claim that they face a threat of prosecution under § 3003.1, and that they "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). Whether viewed as a factor of standing or ripeness, the trappers must show a "genuine threat of imminent prosecution" under § 3003.1. *Id.* The court must consider whether any such a threat creates for the trappers "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.*

The Ninth Circuit identifies three factors to determine the likelihood of such an injury: (1) the trappers' plans to violate the law, (2) the authorities' specific plans or threats to enforce the law, and (3) the history of actual enforcement of the law. *See San Diego,* 98 F.3d at 1126–27; *San Francisco County Democratic Cent. Comm. v. Eu,* 826 F.2d 814, 821–22 (9th Cir.1987).

First, the trappers state no concrete plans to violate the statute. They do not say when, where, or under what circumstances they intend to engage in trapping that violates the law. Indeed, they specifically allege that they have voluntarily ceased any actions that might violate the statute. Thus, the facts alleged by the trappers do not rise to the level of an articulated plan of action that could give rise to an "imminent" injury. *Lujan,* 504 U.S. at 564, 112 S.Ct. 2130.

 Second, regarding the authorities' threats of enforcement, the trappers assert that there was a general threat of enforce-

ment in the DFG's November 1998 press release. However, "a general threat of prosecution is not enough to confer standing." *San Diego,* 98 F.3d at 1127 (9th Cir.1996); *see Rincon Band of Mission Indians v. County of San Diego,* 495 F.2d 1, 5 (9th Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974) (holding that sheriff's statement to tribal members that county ordinance prohibiting gambling would be enforced within his jurisdiction was insufficient). There is no evidence of a more specific threat here. This court has already held on prior motions, and now reaffirms, that the DFG press release does not constitute a threat of enforcement adequate to confer standing. By its express language, the press release is little more than a description of the new law, coupled with a generic admonition that "individuals affected by Proposition 4 should follow its provisions where they actually conflict with existing regulations on trapping." The press release does not increase the likelihood or possibility of prosecution by any appreciable measure.

 The third factor is the history of enforcement of the statute. In this case, there is very little history to evaluate. Over the two years of Proposition 4's life, the parties report just one prosecution. The court has reviewed that one case and finds it less than compelling. The § 3003.1 charges in that case were just ones among many other overlapping and redundant charges. And the prosecution appears to have been driven by the fact that the defendant was using snare traps in an especially dangerous manner, within city limits and across the street from a "plethora of residences." *See Genaro* at 4.[3] In any event, as this court noted on a

---

**3.** Along with five beavers, the defendant also apparently snared a pet dog. Interestingly, the local prosecutors in *Genaro* took the position that Proposition 4 merely limited the use

of snares "to only lawful depredation trapping under permit pursuant to Fish and Game Code section 4180 *et seq.*" *Genaro* at 1. Indeed, the Superior Court relied on the Legis-

prior motion, just one prosecution does not create a history of enforcement for purposes of issuing an injunction. *See also, e.g., Adult Video Ass'n v. Barr,* 960 F.2d 781, 784 (1992), rev'd on other grounds, 509 U.S. 917, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), adopted in pertinent part sub nom. *Adult Video Ass'n v. Reno,* 41 F.3d 503, 504 n. 1 (9th Cir.1994)("active enforcement" of a statute creates a reasonable fear of prosecution).

Having considered the relevant factors, this court concludes that there is no present and genuine threat of enforcement of Proposition 4 against the trappers sufficient to create standing for the issuances of an injunction. The trappers' first, third, and seventh causes of action are therefore dismissed. Because the trappers have had several opportunities to amend, the dismissals are with prejudice.

### B. Claim for Dilution of Voting Rights

■ In the sixth cause of action, the trappers allege that they were denied substantive due process because the ballot arguments in support of Proposition 4 were misleading. Specifically the trappers claim that the following language, contained in a section of the ballot materials entitled "Argument in Favor of Proposition 4," was misleading:

Proposition 4 WILL ALLOW the use of traps and other Wildlife management techniques:

-to protect human health and safety

-to protect property, levees and canals

-to protect endangered species

-to protect crops and livestock.

*See* Third Amd. Cmplt. at 18. The trappers claim that this language implies that leghold traps would be permitted for the enumerated purposes, when in fact the Proposition only permitted other than leghold traps to be used for those purposes.

This claim raises different standing issues. Defendants argue that the trappers have not been injured because they do not allege that they were misled into voting for the Proposition. This court finds no direct case authority in support of defendants' argument. There is certainly no support for it in *Burton v. State of Georgia,* the Eleventh Circuit case that both parties cite as precedent. *See* 953 F.2d 1266 (11th Cir.1992). That court instead spoke of "dilution of the right to vote" through a "patently and fundamentally unfair" election process, and did not base its decision on an individual voter's injury from having been personally misled. *Id.* at 1269.

However, even assuming that the trappers have standing, their claim fails as a matter of law. A standard for evaluating ballot language was announced by the Eleventh Circuit in *Burton,* and the parties here do not dispute that standard:

As long as the citizens are afforded reasonable opportunity to examine the full text of the proposed amendment, broad-gauged unfairness is avoided if the ballot language identifies for the voter the amendment to be voted upon. Therefore, substantive due process requires no more than that the voter not be deceived about what amendment is at issue.

*Id.*

The Eleventh Circuit arrived at this standard after recognizing the strong principles of federalism that discourage federal court intervention in state elections, and recognizing that no federal court had inval-

---

lative Analyst's analysis, as presented to the voters, that "Other body gripping-traps [than steel-jawed leghold traps] ... could still be used for protecting livestock and other property, endangered species, and public

health...." *Genaro* at 4. Thus, in theory, had Mr. Genaro simply been using snares to stop depredation, in a safe and prescribed manner, he would not have been prosecuted.

idated a state election on grounds such as those asserted. *Id.* at 1268, 1269. "For such extraordinary relief to be justified, it must be demonstrated that the state's choice of ballot language so upset the evenhandedness of the referendum that it worked a 'patent and fundamental unfairness' on the voters. Such an exceptional case can arise ... only when the ballot language is so misleading that voters cannot recognize the subject of the amendment at issue." *Id.* at 1369.

Whether specific ballot language is misleading under that standard is a question of law. *Id.* at n. 2. The ballot language of which the trappers complain is not the text of the proposition. Nor was it in the summary of the proposition or the neutral legislative analysis of the proposition. Rather, it was in the avowedly partisan *"Argument* in Favor of Proposition 4" submitted by various individuals and groups who favored Proposition 4. Because it was obviously an argument, it militates against any finding that it caused a "patent and fundamental unfairness." The court notes that the ballot materials also included arguments *against* Proposition 4. Further, the contested language was not literally false, and the neutral legislative analysis provided further clarification. Assuming that the "Argument in Favor ..." was misleading at all, it was simply not so misleading that the voters would not understand the subject of the proposition that they were voting on. It was unquestionably clear to the voters that the subject of Proposition 4 was a ban on leghold traps. The alleged inaccuracies did not reach the level of fundamental unfairness necessary for an alleged denial of substantive due process.

The sixth cause of action is therefore dismissed. And because the issue is one of law as applied to the admitted language, no further amendment to the complaint could change the result.

## C. Claim of Commerce Clause Violations

The trappers' second cause of action presents two discernible arguments about how Proposition 4 could violate the commerce clause. First, the trappers contend that Proposition 4 directly regulates and discriminates against interstate commerce — a "per se" violation of the commerce clause — affecting: (1) trappers who transport and sell fur into and from California, *see* TAC at 2:27–28; (2) trappers who engage in trapping involving interstate commerce, *see* TAC at 3:9–10; and (3) individuals who import fur from animals trapped outside the state for sale in California, *see* TAC at 8:13–20. Second, the trappers contend that Proposition 4 will result in damage to California's levees and increase livestock losses; the legal theory implicit in this argument is that these potential costs place an excessive burden on interstate commerce relative to the law's putative benefits.

This court has already ruled against the per se violation arguments that the trappers made in their prior complaints. The trappers acknowledge that they have not strengthened their allegations in the TAC, and they merely reiterate them for purposes of appeal. *See* TAC at 6 n. 1. The court therefore affirms that the trappers have not alleged a cause of action based on a direct impact on interstate commerce for the following reasons.

The trappers have not alleged an "actual injury" that gives them standing to challenge Proposition 4's alleged discrimination against interstate commerce. As discussed above, they do not allege the genuine and imminent threat of prosecution necessary to confer standing, and the mere existence of the statute is insufficient.

Further, even if a trapper had suffered an actual injury, the claim itself fails be-

cause Proposition 4 does not regulate or discriminate against interstate commerce. The trappers imply that the statute regulates interstate commerce by forbidding trade in certain furs trapped out of state; *see* TAC at ¶ 14. But this is a misreading of the statute: its plain language limits its application to furs taken only *inside* California. *See* § 3003.1(b). The Ninth Circuit has also rejected the argument that "any state prohibition of imports or exports is per se discriminatory." *See Pacific Northwest Venison Producers v. Smitch,* 20 F.3d 1008, 1012 (9th Cir.1994). Rather, the standard at issue is one of discrimination, and the statute does not distinguish in-state trappers from out-of-state trappers. To the extent that Proposition 4 might have any discriminatory effect at all, it would be in *favor* of.interstate commerce. The reason is that the California commerce in furs is more likely to be from animals that must be trapped under the restrictions of § 3003.1, while out-of-state trappers face no such restrictions in obtaining furs to sell in California. *See Reynolds v. Buchholzer,* 87 F.3d 827, 830 (6th Cir.1996)(recognizing that a ban on walleye fishing in Ohio would likely "act as a boon to out-of-state fisherman" who could sell their walleye without local competition). Because neither the purpose nor the effect of the statute is "economic protectionism," (*see Pacific,* 20 F.3d at 1012), Proposition 4 does not unconstitutionally discriminate against interstate commerce.

The trappers' second commerce clause argument is that even if Proposition 4 is not discriminatory, its effect is that "interstate commerce . . . will be burdened and decreased." *See* TAC at 12:28–29. Attached to the TAC is information to document the purportedly future economic costs of Proposition 4, primarily as a result of flood damage from weakened levees and increased costs of livestock products due to predation. *See* TAC at ¶¶ 18–22.

The trappers' "levee" theory is highly speculative. The trappers' allege that Proposition 4 will cause water districts to stop hiring trappers to protect their levees by using leghold traps; without leghold trapping, rodents will weaken the levees; if it rains hard, the levees will fail; if the levees fail, there will be a financial impact on California goods that are sold in interstate commerce. While water districts themselves are the parties that would be most clearly injured under the trappers' theory, no water district has joined this suit. This court has already expressed its skepticism that this claim is ripe (*see* November 12, 1999 Transcript at 16:7), and now conclude that it is not. Moreover, the trappers do not specify any actual injury that would grant standing to them. Even if the problems of ripeness and standing were cured, however, this theory also fails to state a claim for the same reasons as the trappers' "higher cost of products" argument:

That argument is essentially that Proposition 4 will be expensive for consumers nationwide. That argument, however, does not mean that the statute is therefore unconstitutional. The trappers must demonstrate that the statute places burdens on interstate commerce that are "clearly excessive in relation to its putative local benefits." *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 472, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981)(applying the *"Pike"* test; *see Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). Most courts have concluded that *Pike* did not authorize a "general-purpose balancing;" instead, courts look specifically "for discrimination rather than for baleful effects." *Amanda Acquisition Corp. v. Universal Foods Corp.,* 877 F.2d 496, 505 (7th Cir.1989). The Ninth Circuit has held that to satisfy the *Pike* test for establishing a burden on interstate commerce:

**1174**

the burdens of the statute must so outweigh the putative benefits as to make the statute unreasonable or irrational. Such is the case where the asserted benefits of the statute are in fact illusory or relate to goals that evidence an impermissible favoritism of in-state industry over out-of-state industry.

*Alaska Airlines, Inc. v. City of Long Beach,* 951 F.2d 977, 983 (9th Cir.1991). The TAC fails to allege a claim under that standard.

■ The purpose of Proposition 4 is to protect wildlife and pets from certain types of injuries and death. Far from being illusory, this is a permissible exercise of the state's legitimate interest in the protection of animal life, and the trappers have not alleged otherwise. *See Baldwin v. Montana Fish & Game Comm'n,* 436 U.S. 371, 391, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978) ("protection of the wildlife of the state is peculiarly within the police power, and the state has great latitude in determining what means are appropriate for its protection"); *Pacific Northwest Venison,* 20 F.3d at 1013 ("protection of wildlife is one of the state's most important interests").

Nor have the trappers alleged that the statute favors in-state industry over out-of-state industry, or that it burdens interstate commerce more than intra-state commerce. *See Alaska Airlines,* 951 F.2d at 984; *New York State Trawlers Assoc. v. Jorling,* 16 F.3d 1303, 1308 (2d Cir.1994)(holding that "the 'incidental burdens' are the burdens on interstate commerce that exceed the burdens on intra-state commerce") (citing *Clover Leaf Creamery,* 449 U.S. at 471–72, 101 S.Ct. 715). But, the costs of this statute will if anything fall more heavily on Californians. The trappers simply allege that the law will be expensive, and that those expenses will be borne everywhere in the form of higher prices for crops or livestock products. But the question of whether a price is too high does not implicate the commerce clause in this case. *See e.g., Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 127, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi,* 474 U.S. 409, 416, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986). Instead, it calls for a cost-benefit analysis that the legislature or the voters are authorized to make. *See Alaska Airlines,* 951 F.2d at 984.

The second cause of action of the TAC is therefore dismissed with prejudice.

### D. Claims for Declaratory Relief

■ The trappers' fourth cause of action seeks a pre-enforcement declaration that Proposition 4 is unconstitutional, and the fifth cause of action seeks a declaration of the scope of Proposition 4. The court denies those requests on the grounds that no Article III case and controversy has been established, and that the allegations of the TAC do not support the court's exercise of its jurisdiction under the Declaratory Judgment Act.

■ The Declaratory Judgment Act is intended to permit persons to avoid the choice between refraining from prohibited conduct and risking punishment, by creating a mechanism for pre-enforcement review. Pre-enforcement review is not available in all cases, however, because a court must have before it "a case of actual controversy within its jurisdiction." *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–40, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Cases seeking relief under the Declaratory Judgment Act are usually viewed as presenting issues of ripeness rather than standing (although the issues are often practically indistinguishable). The "basic rationale" of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling

themselves in abstract disagreements." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In determining whether to grant pre-enforcement review under the Declaratory Relief Act, the court considers the potential "hardship to the parties of withholding court consideration," and also the "fitness of the issues and record for judicial review." *Id.* at 149, 87 S.Ct. 1507.

The trappers have not identified any substantial consequences that they are likely to face if declaratory relief is not granted. As discussed above, enforcement is far from certain, and the mere existence of the statute, which may or may not ever be applied to plaintiffs, is insufficient to satisfy the "actual controversy" requirement of the Declaratory Judgment Act. Even "the possibility of criminal sanctions applying does not of itself create a case or controversy." *Boating Industry Associations v. Marshall,* 601 F.2d 1376, 1384 (9th Cir.1979); *see also Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)(holding that plaintiff need not await enforcement where two fellow protesters had already been arrested and compliance required giving up possibly protected speech). If the trappers comply with the statute, they face primarily economic consequences. But unlike the situation in *Abbott,* it is very difficult for this court to evaluate the cost of unnecessary compliance, and the trappers themselves have not done so in any particularized way. *See Abbott,* 387 U.S. at 152–53, 87 S.Ct. 1507.

▉ Nor are the issues and the allegations presented by the trappers fit for judicial review. This is apparent from the TAC as a whole, which takes an everything-but-the-kitchen-sink approach to challenging Proposition 4. The two causes of action for declaratory relief are particularly unfocused and all-encompassing; *see* TAC at 17:8–11 and 17:22–18:13. At bottom, Proposition 4 has not been interpreted, applied, or enforced in any way that invites judicial review or pre-enforcement declarations.[4] Rather, the trappers' TAC invites "entanglement" in an "abstract disagreement," *see Abbott,* 387 U.S. at 148, 87 S.Ct. 1507, an invitation this court declines. Under the Declaratory Judgment Act, a district court may decline to exercise jurisdiction over a declaratory action even though subject matter jurisdiction is otherwise proper. *See* 28 U.S.C. § 2201(a); *Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942).

## V.

▉ The complaint that initiated this litigation by plaintiffs is much narrower. Plaintiffs argue that some applications of Proposition 4 are preempted by federal statutes, including (1) the Endangered Species Act (ESA), 16 U.S.C. § 1532(c)(3); (2) the Migratory Bird Treaty Act (MBTA), 16 U.S.C. § 702; and (3) the National Wildlife Refuge System Improvement Act (NWRSIA), 16 U.S.C. § 668dd. Plaintiffs seek a declaration to that effect, and an injunction preventing the state defendants from enforcing Proposition 4 against persons acting under federal authority to conserve various species. They also seek to enjoin USDA/APHIS from removing its leghold traps in order to comply with Proposition 4. In essence plaintiffs seek to exempt trapping by federal agents for the purpose of preserving wildlife from the prohibition of Proposition 4.

The state defendants and the sponsors of Proposition 4 contend that plaintiffs'

---

4. With the exception of certain discrete issues raised by the original plaintiffs in their complaint, which are addressed below.

claims are not ripe and that plaintiffs lack standing. On the merits of the presumption issue, they also argue that Proposition 4 is not preempted by federal law, because it can be interpreted so as not to conflict with federal conservation efforts, and will not be interpreted or enforced to conflict with those efforts.

The federal parties agree with plaintiffs for the most part. They argue that plaintiffs do have standing. They urge the court to enjoin the enforcement of Proposition 4 against federal conservation efforts under the ESA, MBTA and NWRSIA.

### A. Plaintiff's Proposed Amendment to the Complaint

Plaintiffs' original complaint did not allege that Proposition 4 was preempted by the NWRSIA, 16 U.S.C. § 668dd. That act requires the United States Department of the Interior to administer individual NWRs to achieve the purposes of the act. In the case of the San Francisco Bay NWR, that includes protecting migratory waterfowl and other wildlife, including wildlife protected by the ESA or the MBTA. *See* Pub. Law 92–330, 86 Stat. 399. Plaintiffs have moved for leave to amend their complaint to include this additional ground for preemption, and also to clarify that the MBTA implements a number of separate international treaties. While the motion to amend is late in the history of this case, plaintiffs argue that they are not adding new claims.

At this stage of the case plaintiffs may amend their complaint only by leave of the court or by stipulation of the parties. Fed.R.Civ.P. 15(a). Leave to amend is liberally granted in most circumstances. But it can be denied if the court finds: (1) plaintiffs unduly delayed in seeking leave to amend; (2) the amendment would cause undue prejudice to the opposing party; (3) the amendment is grounded in bad faith or a dilatory motive; or (4) the amendment is

futile. *See Schlacter–Jones v. General Telephone*, 936 F.2d 435, 443 (9th Cir. 1991). The Ninth Circuit frowns on late amendments where the party seeking the amendment has known of the new facts or theories for some time, *see Royal Ins. Co. of America v. Southwest Marine*, 194 F.3d 1009, 1016–17 (9th Cir.1999); *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir.1990), or where the amendment is offered very late in the proceedings, such as after the close of discovery or when dispositive motions are pending; *see Schlacter–Jones*, 936 F.2d at 443.

Plaintiffs here have waited a long time to move to amend their complaint. They apparently contemplated the amendment as early as February 1999, but did not seek leave to amend until eleven months later when they filed their motion for summary judgment. At that point the case was more than a year old and discovery had closed.

Nonetheless, the proposed amendment does not alter the general legal theory alleged by plaintiffs; it is still federal preemption. While the amendment affects some of the legal analysis, such as requiring examination of the NWRSIA, the necessary facts have already been gathered and the issues argued. And as discussed below, the NWRSIA simply adds a component to the MBTA-related preemption arguments that plaintiffs have already made. The amendment really concerns new *arguments* and not new causes of action. There is little prejudice to the other parties. Because there is no evidence of a dilatory motive, and the changes will enable this court to address all of the challenges to Proposition 4, plaintiffs' motion for leave to amend is granted. The remainder of this order is therefore based upon the First Amended Complaint.

### B. Jurisdiction to Enforce the Supremacy Clause

The sponsors' motion for summary judgment argues that this court lacks jurisdiction because plaintiffs are "implying" an independent cause of action under the supremacy clause of the U.S. Constitution, even though "there simply is no such legal creature." The sponsors suggest that this is an effort to evade plaintiffs' failure to comply with the notice requirements for a citizen's suit under the Endangered Species Act.

However, that argument mischaracterizes plaintiffs' suit. Plaintiffs' complaint is based on the time-tested principle of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In *Young,* the U.S. Supreme Court held that a general grant of jurisdiction to the federal courts by Congress, such as 28 U.S.C. § 1331, empowers the federal courts to enforce the supremacy clause through equitable relief against state officials.[5] In *Bud Antle, Inc. v. Barbosa,* 45 F.3d 1261 (9th Cir.1994), the Ninth Circuit acknowledged and applied this "general rule that a private party may seek declaratory and injunctive relief against the enforcement of a state statutory scheme on the ground of federal preemption ... even in the absence of an explicit statutory provision establishing a cause of action." *Id.* at 1269.

### C. Standing

▮▮▮▮ Plaintiffs must satisfy the same three requirements for Article III standing that apply to the trappers. Plaintiffs must have suffered an injury in fact that is "concrete and particularized" and "actual or imminent." Plaintiffs' injury must be "fairly traceable" to the challenged actions of the defendants, and "not ... the result of the independent action of some third party not before the court."

And it must be "likely" that plaintiffs' injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted). As the parties invoking federal jurisdiction, plaintiffs bear the burden of establishing those elements of standing. *Id.* at 561, 112 S.Ct. 2130.

The state defendants and the sponsors argue that, like the trappers, plaintiffs lack standing to bring this suit because there is no threat to enforce Proposition 4 against federal authorities engaged in conservation activities. Defendants suggest that plaintiffs have really sued the wrong party; that is, if there is a wrongdoer, it is the U.S. Department of Agriculture, which chose to stop using leghold traps for conservation under its USA/APHIS program, even though Proposition 4 was not enforced against it. Defendants also argue that this lawsuit might be in vain, because the Department of Agriculture will not necessarily resume its leghold trapping even if this court declares Proposition 4 unconstitutional as to its program.

▮▮▮ Plaintiffs have presented evidence of a cognizable *type* of injury. An injury to plaintiffs' aesthetic and scientific interests in the observation of wildlife is sufficient to meet the constitutional requirements for standing; *see Lujan,* 504 U.S. at 562–68, 112 S.Ct. 2130; *Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986); *Didrickson v. United States Dep't of the Interior,* 982 F.2d 1332, 1340–41 (9th Cir.1992). And plaintiffs have demonstrated that they enjoy and observe wildlife in a number of specific areas where federal conservation activities, including leghold trapping, have occurred.

---

**5.** The state defendants here raise the defense of immunity. But in light of *Ex Parte Young* that argument is really one of plaintiffs' alleged lack of standing and ripeness.

If that wildlife were injured, then plaintiffs' legally protected interests are harmed.

But has such an injury actually occurred? And since plaintiffs seek injunctive or declaratory relief, is such an injury likely to happen in the future? *See Los Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Defendants argue that the answer to both questions is no, focusing on the fact that the state has never threatened to enforce Proposition 4 against federal conservation trapping. However, this mistakes the nature of plaintiffs' injury. Plaintiffs are not claiming a direct injury from threatened criminal prosecution. Nor are plaintiffs making a generalized claim that the statute's mere existence inhibits them. *See Del Percio v. Thornsley,* 877 F.2d 785, 786–87 (9th Cir.1989) (a "generalized claim that the statute's very existence has an inhibiting effect" does not justify injunctive relief). Rather, plaintiffs are actually injured by the fact that the federal authorities are obeying the state statute. Plaintiffs' injury was concrete when the federal government removed the traps that protected the wildlife in which plaintiffs are interested. Those traps were returned only after this court's preliminary order in 1999. And if that order is lifted, the traps will likely be removed again. *Cf. Lyons,* 461 U.S. at 102, 103 S.Ct. 1660 ("Past wrongs were evidence bearing on whether there is a real and immediate threat of repeated injury"); *Lujan,* 504 U.S. at 593, 112 S.Ct. 2130 (J. Blackmun, dissenting, citing cases where the imminence of harm turned on "speculative" actions of third parties beyond a plaintiff's control).

■■■ Defendants also argue that there is no causation between Proposition 4 and the plaintiffs' injury. The Department of Agriculture stands in between, and defendants argue that the USDA is the real "cause" of plaintiff's injury because USDA

independently decided to remove their traps. The mere fact that causation is indirect, however, is no barrier to standing. *See, e.g., Nat'l Wildlife Fed. v. Hodel,* 839 F.2d 694, 705 (D.C.Cir.1988)(citing *Meese v. Keene,* 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987)). Further, what matters is not the "length of the chain of causation," but rather the "plausibility of each of the links." *Autolog Corp. v. Regan,* 731 F.2d 25 (D.C.Cir.1984); *see also Duke Power Co. v. Carolina Envtl. Study Grp.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Thus, while "the indirectness of the injury ... may make it substantially more difficult" to meet the requirements for standing, *Warth v. Seldin,* 422 U.S. 490, 505, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the question of whether causation is too "highly indirect" or "purely speculative" is primarily a matter for case specific determination, *Allen v. Wright,* 468 U.S. 737, 758, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

> When, however, ... a plaintiff's asserted injury arises from the government's allegedly unlawful regulation ... of *someone else,* much more [proof than usual] is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the third party to the government action or inaction....

*Lujan,* 504 U.S. at 561–62, 112 S.Ct. 2130.

This court concludes that plaintiffs' injuries are traceable to the state defendants. The injury is not hypothetical. After Section 3003.1(c) was adopted, the state DFG issued its press release regarding leghold traps, and the USDA complied by removing its traps. When this court's preliminary order was issued in 1999, the traps were replaced. The link between the statute and USDA's actions is more than "plausible," it is actual. *See Autolog,* supra.

The DFG's press release confirmed that

DFG and other governmental agencies will now have to use traps other than leg-hold traps to control predators, including those that prey on threatened and endangered species in California. While it wasn't an enforcement threat, the press release was an official interpretation of the law, confirming that the ban applied to government agencies. That interpretation has never been rescinded or contradicted by any other state authority, including most notably the Attorney General.[6]

After Proposition 4 was enacted, the USDA complied with the statute. That compliance was neither unreasonable nor unforeseeable. Under the language of Section 3003.1, the ban on leghold trapping expressly applies to federal conservation activities. The USDA's response in complying with the new law was a "normal consequence." The causation element is satisfied.

The redressability required for standing is also satisfied, as evidenced by the apparent success of this court's preliminary declaratory order. Plaintiffs have standing to bring this action for injunctive and declaratory relief.

The court recognizes that it has found a lack of standing by the trappers, whose interests are economic, while finding standing by the plaintiffs, whose interests are mostly aesthetic. The reasons for that difference here are two: (1) The U.S. Supreme Court has already recognized the type of standing that plaintiffs claim here (see *Lujan v. Defenders of Wildlife,* above), while the trappers' position is subject to more generalized standing analysis. (2) The trappers seek standing to challenge all of Proposition 4 as unconstitution-al, while plaintiffs challenge only one section, and only its application to federal trapping programs which do impact plaintiffs.

### D. Ripeness

■ Defendants argue that plaintiffs' claims regarding the MBTA are not ripe. Defendants argue that there is no currently active program using leghold traps to conserve birds that are protected by the MBTA but are not protected by the ESA; that is, migratory birds that are not endangered. As this court has noted on more than one occasion at hearings in this case, the traps do not work just on mammals who eat birds protected by a specific act of legislation. Once traps are in place to capture mammals, it matters little which species are intended for protection. The traps protect both threatened and non-threatened species of birds, since mammals cannot read and they step into traps ignorant of statutory distinctions.

Further, the evidence indicates that MBTA-targeted trapping *has* occurred in the recent past (at the San Francisco NWR, for example), and may become necessary again in the near future. If it does, that need will arise suddenly, and predators can decimate bird populations faster than courts can react. Under one legal standard, the injuries to bird life populations are actual and are capable of repetition while evading review. Under another legal standard, the injuries to plaintiffs are ongoing, because a USDA/APHIS policy of not using leghold traps places protected bird life at greater risk than before Proposition 4 was passed. By either standard of legal reasoning, plaintiffs' claims are ripe.

---

**6.** The state defendants argue that they do *not* interpret § 3003.1(c) to restrict trapping that protects endangered species. This assertion might dispose of major portions of this litigation if it were based upon some official pronouncement. See *Abbott Laboratories v. Gard-ner,* 387 U.S. 136, 154, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)(finding Department of Justice representations that criminal enforcement was not forthcoming to be insufficient to defeat standing.) But it is stated only in the litigation arguments.

*E. Preemption*

It is important to note two points: (1) Plaintiffs do not contend that *all* of Proposition 4 is preempted by federal law. They argue only that its application to trapping by federal authorities is preempted. (2) In that conclusion, all of the parties *agree.* Indeed, that end result is so unanimous that the court wonders why the parties have expended so much litigation effort in agreement with each other.

Plaintiffs identify at least three sources of federal law that preempt the enforcement of Proposition 4 against federal agencies: the MBTA, the ESA and the NWRSIA. To these the federal parties add one more: the general supremacy of federal authority over federal lands.

 The court discusses the last point first. Much of the trapping that plaintiffs are concerned with takes place on federal lands, such as NWRs. In general, "activities of the Federal Government are free from regulation by any state," *Mayo v. United States,* 319 U.S. 441, 445, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943), unless Congress has expressly permitted such regulation; *see Hancock v. Train,* 426 U.S. 167, 178–179, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976). The property clause of the U.S. Constitution, art. IV, sec. 3, cl. 2, grants Congress "complete power" over federal land. *Kleppe v. State of New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). In *Hunt v. United States,* for example, federal authorities implemented a program to kill deer that were overpopulating the Kaibab National Forest in Arizona. 278 U.S. 96, 49 S.Ct. 38, 73 L.Ed. 200 (1928). The state arrested federal contractors for violating the state's deer-hunting restrictions. The U.S. Supreme Court ultimately held that Arizona's game laws could not restrict the federal government's power to protect its lands and property. *Id.* at 100, 49 S.Ct. 38.

Here federal agencies have implemented leghold trapping programs on national wildlife refuges, and the parties do not question their authority to do so under the ESA, the MBTA, and the NWRSIA. Those federal statutes do not grant permission to the State of California to regulate federal conduct on federal lands in California.

 The District Court of Wyoming recently considered Wyoming's claims that the power to regulate wildlife on public lands was reserved to the states by the Tenth Amendment, and that the NWRSIA similarly reserves wildlife management rights to the states. *See Wyoming v. United States,* 61 F.Supp.2d 1209 (D.Wyo. 1999). The District Court rejected Wyoming's bid to force the vaccination of elk living in the National Elk Refuge. That court held——correctly, this court believes——that the property clause of the constitution grants the power to regulate wildlife on public lands to the United States, and that the NWRSIA grants the Secretary of Fish and Wildlife Services "complete administrative and management authority" over wildlife in national refuges. 61 F.Supp.2d at 1216–17 and 1220. That court recognized that the "saving clause" in the NWRSIA reflected only a Congressional intent that the NWRSIA should not otherwise supplant the states' ordinary role as managers of the wildlife within their borders, and that the Secretary should make decisions consistent with local regulations "to the extent possible." 61 F.Supp.2d at 1221 (quoting 16 U.S.C. § 668dd(m)).

 This court agrees, and concludes that the State of California may not regulate the manner in which wildlife is managed by federal authorities on federal lands[7] by prohibiting the use of certain

---

7. Including under the NWRSIA.

traps.

This leaves only the question of federal conservation trapping in situations that do not implicate the property clause of the constitution. It is well-established that the supremacy clause of the constitution, Art. VI, cl.2, invalidates state laws that "interfere with, or are contrary to," federal law. *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)(quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)). Under the supremacy clause, federal law may supersede state law in several ways. First, Congress may expressly preempt state law. *Id.* Second, preemption may be inferred where Congress has occupied a given field with comprehensive regulation. *Id.* Third, a state law is nullified to the extent that it actually conflicts with federal law. "Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility.'" *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)). This last type of preemption is particularly appropriate here.

The stated purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species ...." 16 U.S.C. § 1531(b). The ESA states the express policy of Congress "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." 16 U.S.C. § 1531(c). And finally, the ESA provides that

> the terms "conserve," "conserving," and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures ... are unnecessary. Such methods and procedures ... in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

16 U.S.C. § 1532.

The express language of Proposition 4 attempts to put limits on federal ESA-related conservation efforts. Specifically, § 3003.1(c) states that "it shall be unlawful for any person, *including an employee of the federal ... government*, to use or authorize the use of any steel-jawed leghold trap." (emphasis added). A single exception is stated; that is, the protection of human health or safety—not for protection of endangered species. There is no probative evidence that any other meaning of that section was intended at the time Proposition 4 was approved, either in the Legislative Analyst's Digest and the voter pamphlet arguments made by the initiative's proponents. *See e.g. Taxpayers to Limit Campaign Spending v. Fair Political Practices Comm'n*, 51 Cal.3d 744, 274 Cal.Rptr. 787, 799 P.2d 1220 (1990)(describing the limited types of evidence probative of the intent or design of legislation).

Thus, to the extent that Cal. Fish & Game § 3003.1(c) now prevents federal agencies from protecting endangered species under the ESA in situations where those agencies conclude that leghold trapping is necessary, the state statute conflicts with the ESA and is preempted.

The MBTA operates under purposes and policies similar to those of the ESA, except that it seeks to protect different categories of bird life. It has as its goal the "protection of migratory birds," 16 U.S.C. § 712(b), with specific species being enumerated in various international trea-

ties to which the United States is a signatory, *id.* at § 703. The Secretary of the Interior is charged with taking "such measures as are necessary" to manage the "preservation, distribution, introduction, and restoration of game birds and other wild birds." *Id.* at § 701. Such measures include encouraging the hunting of over populous bird species; *see, e.g.,* the Arctic Tundra Habitat Emergency Conservation Act, Pub.L. 106–108, §§ 1 to 5 (Nov. 20, 1999)(directing the Secretary of the Interior to encourage hunting, among other strategies, of the over populous Mid–Continent Light Goose), and trapping predators like the non-native red fox.

Just as under the ESA, a state regulation such as § 3003.1(c) that conflicts with the Secretary's ability to protect migratory birds under the MBTA is preempted. *See, e.g., Calipatria Land Co. v. Lujan,* 793 F.Supp. 241, 244 (S.D.Cal.1990)(California regulation allowing hunters on licensed grain feeding clubs to hunt ducks from 250 yards away was in conflict with federal antibaiting regulations promulgated under the MBTA and pursuant to the supremacy clause could not stand.)

The court has already commented upon the degree of agreement among the opposing parties on this issue. All agree that because of preemption Proposition 4 cannot be enforced against federal trapping.

## VI.

For the reasons stated above:

1. The court dismisses with prejudice the third amended complaint of the trappers.

2. The court grants the motion for summary judgment of the plaintiffs, and denies the motions for summary judgment of the state defendants and the sponsors.

3. The court declares under the Declaratory Judgment Act that the application and enforcement of § 3003.1(c) of the California Fish & Game Code against fed-eral agents engaged in conservation activities violates the supremacy clause of the constitution. The court also declares that § 3003.1(c) violates the property clause of the constitution to the extent that it is applied or enforced against federal efforts to manage wildlife on federal lands.

4. Because of the declaration in paragraph 3, and the parties' agreements as to the interpretation of § 3303.1(c), the court concludes that no injunctive relief is necessary or appropriate. There is no present threat of enforcement of the statute against federal wildlife trapping.

IT IS SO ORDERED.

## JUDGMENT

For the reasons stated in the Order On Motions To Dismiss And For Summary Judgement signed and filed this date, JUDGMENT is hereby entered:

1. Dismissing the action brought by the National Trappers Association and its affiliated interests.

2. Declaring that Section 3003.1(c) of the California Fish and Game Code cannot be applied to the activities of agencies, employees, or contractors of the United States of America engaged in the management of wildlife on federal lands or in conservation efforts under federal law.

3. Dismissing the claims for injunctive relief.